ISAAC COOK, Appellant, *v.* EDWIN HUNT, Appellee.

#### APPEAL FROM THE SUPERIOR COURT OF CHICAGO.

The acts depended upon to prove an estoppel *in pais*, must be of such a character as to leave no doubt that the party claimed to have been estopped, intended to assume a position inconsistent with his right, to make the claim sought to be barred.

The declarations and statements of an agent within the scope of his duties, are properly admissible in evidence against his principal.

The contents of a written contract cannot be proved, until the absence or loss of the writing has been fully and satisfactorily shown.

And when the contract has a particular place of deposit, or has been traced to the hands of a particular person, such place must be searched, or the person produced or accounted for.

Cook *v.* Hunt.

The statements of a witness are admissible, when the object is to lay a foundation for impeaching him.

Persons called to sustain the character of an impeached witness, are bound to swear that they know his general character for truth and veracity, otherwise they cannot be heard on that point.

If the law is correctly laid down in instructions given to the jury, this court will not reverse the judgment simply because they were not marked "given."

SUIT commenced by Edwin Hunt against Isaac Cook, by summons. Declaration contains only the common counts for work and labor done, and materials furnished, money lent and paid, money had and received; goods, wares and merchandise sold and delivered, and labor, care and diligence bestowed. Damage, $3,500.

Plea, general issue. Cause tried before VAN H. HIGGINS, Judge, and a jury, and verdict for $1,678.83. Motion for new trial overruled, and judgment upon verdict; and appeal prayed and allowed.

On the trial, the plaintiff introduced *Carlton Drake*, who, being duly sworn, testified as follows: Knows "Young America," and knows of work being done on it by the plaintiff—rendered an account of the work done on it every week to Mr. Hunt. Witness was Hunt's foreman in the plumbing business. The work was done for Mr. Cook, on the Young America building, by Mr. Hunt. Witness superintended the sheet iron, tin and plumbing work; work was done in 1854, or commenced then, and continued in 1855. Heavy piece of work; one item was five hundred and forty-three and a half pounds of coil pipe, at one shilling per pound; three stink traps. Mr. Hunt made a large part of the entries. Mr. Cook went through with me several times, and I showed him the work. He said it was all right, go ahead. Van Osdell & Olmstead were the architects. Witness took the order from Mr. Olmstead, who represented himself as the exclusive agent of Mr. Cook. Witness usually took the orders from plaintiff in his business, in this case, from Mr. Olmstead. Knew Charles Christopher was a coppersmith. Never spoke to him about any plumbing work, nor knew of his undertaking any plumbing work, and never knew that he undertook the plumbing work at any time.

*Cross-examination.*—Commenced with Mr. Hunt, August 1st, 1854—left his concern three years since. I was to receive a portion of the proceeds of this work, and ten or twelve dollars a week besides. My pay depended in part upon the proceeds.

(The defendant objects to the witness as incompetent, and moves to exclude him and his testimony; the court overruled the objection, and the defendant excepts, which is noted.)

The defendant's counsel presents the witness with the archi-

Cook *v.* Hunt.

tect's certificate, dated December 23rd, 1854. At the date of this, work had been done to the value of seven or eight hundred dollars. I called on Olmstead for estimate. He gave me, for Hunt, an order on Cook. He (Cook) would not pay it. I went back to Olmstead and got this order from Olmstead. Olmstead said Cook was a little notional, and he (Olmstead) would fix it all right.

(This statement by witness of what Olmstead said, was objected to by defendant; objection overruled, and exception taken to the ruling.)

Olmstead then gave me this order.

The paper writing then shown witness is as follows:

$400.                                        *Chicago, December 23rd,* 1854.

I. Cook, Esq. :—*This is to certify that there is due* to C. Christopher, plumber, *the sum of* four hundred dollars *for labor and materials furnished your buildings* on Young America, *as per contract, payable at sight at Chicago.*

Yours respectfully,

No. 1.                                 VAN OSDELL & OLMSTEAD,
Couch's Block, Dearborn Street, Chicago.      *Architects and Superintendents.*

(The parts in *italics* printed in original.) On which is indorsed, " CHRISTOPHER."

*Chicago, December 23rd,* 1854.

I. Cook, Esq.—*Dear Sir:* Pay the within certificate to the bearer, C. Drake, and oblige

Yours respectfully,          CHARLES CHRISTOPHER.

Received two hundred dollars on the within, December 23rd, 1854.

CARLTON DRAKE.

Received the within in full.             CARLTON DRAKE.
*Chicago, December 30th,* 1854.

The other certificate produced to the witness is as follows:

$400. .                                     *Chicago, January 11th,* 1855.

I. Cook, Esq. :—*This is to certify that there is due* to C. Christopher, plumber, the sum of four hundred dollars, *for labor and materials furnished your buildings* on Young America, as per contract, *payable at sight at Chicago.*

Yours respectfully,

No. 2.                                 VAN OSDELL & OLMSTEAD,
Couch's Block, Dearborn Street, Chicago.      *Architects and Superintendents.*

The words in *italics* printed in original.

On which is indorsed " CHRISTOPHER " (at the top.) Then below:

Isaac Cook, Esq.—*Dear Sir:* Please pay the within to C. Drake or order.
*Chicago, January 11th,* 1855.          CHARLES CHRISTOPHER.

Received, Chicago, January 20th, 1855, two hundred dollars on the within.

CARLTON DRAKE.

Received, January 31st, 1855, two hundred dollars on the within.

CARLTON DRAKE.

Cook *v.* Hunt.

*Direct examination resumed by Judge Scates.* — Ques. Was any reason assigned by Mr. Cook, if you ever went to him for payment of the order given payable to Mr. Hunt, or by Mr. Olmstead, when he substituted this as a mode of getting paid, more than Mr. Cook was notional ? Ans. I do n't remember that I ever saw Mr. Cook on that first order. I am inclined to think I did not. Mr. Olmstead, in the first instance, was very particular that I should not go to Mr. Cook in that instance ; says he, " they are crowding Mr. Cook," there were a great many estimates coming in. Of course there was a great deal of competition, says he.

( Burgess objected to evidence of Olmstead's statements. Argued by counsel, and objection overruled. Defendant's counsel excepted.)

Ques. State if anything was said by Mr. Olmstead in reference to Mr. Cook, at the time he was informed that Mr. Cook refused to pay the order, and gave you this order. What did he say, if anything, to show a reason why Mr. Cook would pay it in the form of an order to Christopher, or his indorsement, and would not pay it directly ? Ans. I do n't remember that Mr. Olmstead gave any specific reason, anything further than he took the order and made the light remark, and said he would fix it. I took the order; and told him I did n't want any such order. Says he : " I 'll keep this order until Christopher assigns it to you." That was the first one, I judge, because I took it to Christopher and he signed it.

Ques. Did he give you any reason why he would pay it in that shape ? Ans. Nothing more than I have stated.

Ques. Did he tell you that Christopher was the contractor, and you must go to the contractor ? Ans. I judge not, because I never thought Mr. Christopher had anything more to do with it than you have. I never dreamed that he did, until recently. I had no knowledge in any way or manner that Christopher was in any way connected or interested in that plumbing work with Isaac Cook in the Young America building, until since the work was completed.

*Mr. McAllister.* It is conceded, I suppose, that Mr. Cook was the proprietor of that building.

*Mr. Burgess.* Oh, yes.

Ques. Have you been settled with by Mr. Hunt in full ? Have you any interest in this suit ? Ans. No, sir.

Ques. You have settled with Mr. Hunt and received pay in full for this matter ? Ans. Yes, sir.

Ques. *By the Court.* Were you present when these several entries were made in the books, and did you compare them

from time to time? Ans. Yes, sir; very particularly; Mr. Hunt was very peculiar.

The account (bill of particulars) and the book were here produced, the witness coming down from the witness box and examining and comparing the items in the bill with the entries in the book, assisted by counsel.

Ques. Are they correct? Ans. Yes, sir; and they correspond with the journal. The balance due, is $1,678.83.

Ques. *By the Court.* How far had the work progressed when Mr. Cook spoke to you, or saw you at work on the building? Ans. I should think probably the sticks of soil pipe were in, and the pipes leading through the building for the supply of the water closets, wash room and boilers, and wash basin, were in. That is a pretty heavy amount of material. It was put in before the floors were laid.

Ques. That is, before he first saw you at work? Ans. A good share of it was done before cold weather, probably along early in the fall. The building was a great ways behind the time.

Ques. When did he first see you at work there? Ans. I don't remember distinctly.

Ques. Was it before or after these orders were made, or any of them? Ans. I think there had been one order drawn on him before he saw me. There is an order out yet, in somebody's possession. I don't remember the time distinctly.

Ques. *By Mr. McAllister.* Was he there from time to time while you were doing the work? Ans. Yes, sir; he was there several times during the progress of the work. It was not an unusual thing to see him through the building three or four times a week, perhaps every day.

Ques. Did he know you, personally? Ans. Yes.

Ques. Did he know where you worked? Ans. I think he did.

Ques. What reason have you for thinking so? Ans. From the fact that Mr. Cook has known me, personally, for ten or twelve years, and would be very apt to know. I don't know that I ever took particular pains to tell him, or that any very particular pains ever took place between us as to the work.

Ques. *By Mr. Burgess.* Nor who you were working for? Ans. No, sir. I have seen Mr. Cook at the store several times.

Ques. *By Mr. McAllister.* Do you know that Mr. Olmstead knew that you were at work for Mr. Hunt? Ans. Yes, sir; he knew that we did.

Ques. He was at the shop, was he not? Ans. A great number of times.

Ques. Was he the architect that superintended the work?

Ans. Yes, sir; superintended it in person. I do n't remember ever seeing Mr. Van Osdell in the building with any appearance of superintendence. During the construction of the work, I have seen him in the Young America.

Ques. During what period of time was this work in progress from the time you commenced until you finished? Ans. I am inclined to think from August until after frost came out in February or March. August, 1854, I think it commenced.

Ques. What time do you think you got through? Ans. I am under the impression it was the next March, 1855. I recollect the circumstance of its being very difficult to get the supply in from the street, and the frost was coming out of the ground. The ground was floating a great deal.

Ques. During all this time Mr. Cook was in the habit of coming in several times a week? Ans. Yes, through the winter season.

Ques. And Mr. Olmstead superintended the work during all this time? Ans. Yes, sir.

Ques. *By the Court.* What time did Christopher run away, or go away? Ans. Well, I do n't know. I am not positive; I should think probably along in February or March, 1855.

Ques. Was this man, Christopher, in the plumbing business at all? Ans. I never knew of his having anything to do with it. He carried on the copper work for the Young America. He furnished the boilers for the range and the connection; and also the pipe that took the water from the roof to the main reservoir, that supplies the works below in case of failure of the supply from the hydraulics. It was a large reservoir. That was made of copper. That Christopher made. That was the only work I knew of his doing.

Ques. That was his business? Ans. Yes, sir; he was a coppersmith. I never knew of his doing any plumbing. I never saw any more lead on his place than I could carry off on my back, I am sure.

Ques. His place was next door to Mr. Hunt's? Ans. Yes.

*Second cross-examination by Mr. Burgess.*—Ques. Is it impossible for a man to take a plumbing contract without having lead? Ans. Yes; he might send men out and run a shop away from his place.

Ques. That paper reads "as per contract." Do you know that Christopher has that contract, or not, from that paper? (Objected to.)

*Mr. Burgess.* I want to ask if he do n't understand from the face of that paper, that Christopher had the contract for that work.

*The Court.* That is objectionable.

Ques. Did you read this paper? Ans. Yes; that is, when you handed it to me.

Ques. Did you when you received it? Ans. Yes, undoubtedly. I took it as I have taken a great many orders, or a check. I would look at the amount; I presumed it was a check, and if the amount was paid, I would be satisfied.

Ques. Do you say you took it at the time as a check? Ans. No, I took it as a draft on Isaac Cook.

Ques. In favor of Mr. Christopher? Ans. Well, I supposed—

*Mr. Burgess.* Never mind what you supposed.

*Witness.* I took it as the result in favor of Edwin Hunt.

Ques. But I am asking you what it was. It was an estimate in favor of Christopher, was it not? Ans. If I did not know any better, I should think so, perhaps.

Ques. The paper itself notifies you that it is a contract with Christopher? Ans. No, sir. (Objected to.)

Ques. Is this the book you compared the entries with? (alluding to the book before the witness). Ans. Yes, sir; I think it is.

Ques. *By Mr. McAllister.* Did you say that you took that order as made, paying Mr. Hunt for his services? Ans. Yes, sir, that was the exclusive intention.

Mr. McAllister announced that the plaintiff had several witnesses to prove the work alleged to have been done, to have been actually performed.

Mr. Burgess said, (also Mr. Cook), it was not disputed.

*Lewis Wolf* called, and sworn. Worked for Charles Christopher in the latter part of 1854, and beginning of 1855. He was a coppersmith. Never did any plumbing work. Worked at copper work on Young America. Do n't know about the plumbing work.

*Carlton Drake* recalled. Ques. State, if you please, if you presented the bill of all the work that was done for Mr. Cook by Mr. Hunt? Ans. Yes, sir.

Ques. All mixed up as it had been done, and whether Mr. Cook did not request you to have it divided? Ans. One general bill was presented, including bell-hanging and the tin work.

Ques. Did he make any request to have the bills separated?

*Mr. Burgess.* What did he say? Ans. There was one general bill presented, and Mr. Cook returned the bill with the request that the bill should be separated into three distinct items, which included the bell-hanging, the tin and sheet iron work, and the plumbing work.

Ques. Did he make any objection to any? Ans. I do n't remember that there were any objections made, or any remarks

made in reference to the bill, in any shape or manner, further than I returned the bill, and I supposed the items had been selected.

Ques. It was a general bill, including the items in the order in which the work had been done from week to week? Ans. Yes.

Ques. Of each character of work? Ans. Yes.

Ques. State if Mr. Hunt carried on the tin business? Ans. Yes, sir.

Ques. Is that separate from plumbing? Ans. It is rather a distinct line of business, and could not be connected very conveniently.

Ques. Did he have some tin work done in that building? Ans. Yes, sir; by the same men, orders emanating from the same source, through me.

Ques. Did you superintend the tin department? Ans. Yes.

Ques. Did Mr. Cook make any objection to the manner in which the work was done, or to the paying Mr. Hunt? Ans. He never raised any objections in my presence, or to my knowledge.

Ques. *By Mr. Burgess.* Are you certain that you would have understood them if he had made objections? Ans. It is very reasonable to suppose, if he had objected to any portion of it, I would.

*William B. Olmstead,* for the defendant, testified as follows:

Ques. Did you hear Mr. Drake's testimony this morning? Ans. Yes; I did.

Ques. You are the Olmstead referred to? Ans. I am.

Ques. Do you know anything of the work done on the Young America? Ans. I superintended it, by Mr. Cook's direction.

Ques. The defendant? Ans. Yes.

Ques. Do you know anything about the contract for plumbing work on that building? Ans. I made a contract with Mr. Christopher, by Mr. Cook's orders. It was in writing. I left it in my safe when I went away, and I have not found the man it was left with.

Ques. Did Mr. Hunt do the bell-hanging and some tin work? Ans. I do n't know whether he did or not.

Ques. Who worked at the plumbing? how happened it to be done? Ans. I shall have to tell something of a story to get at the facts. Some time previous to the work being let, Mr. Drake called on me, and said he was prepared to do the plumbing work. He had fixed things so with Mr. Hunt, or it was so arranged with Mr. Hunt, that he was enabled to go on and do any amount of work. I told Mr. Drake I would do all

I could to get him the work. He said he would be glad to have me. It lingered along in that shape for a few days. I told him I thought Mr. Christopher would get the work. From a conversation I had with Mr. Cook, he was inclined to give it to Christopher; he was an acquaintance of his, and he wanted to help a poor man. I told him if he managed right he might get the work of Mr. Christopher, but it would have to be let to Mr. Christopher. I afterwards learned from Mr. Drake that that arrangement had been made, and that he was to do the work for Christopher. I told him under those circumstances I should be favorable to Mr. Christopher having the work. I didn't know anything about Mr. Christopher. About that time Mr. Cook and Mr. Drake and I met, and Mr. Cook ordered me to make the contract with Mr. Christopher to do the plumbing work, with the understanding between Christopher, Drake and myself, that Mr. Drake was to do the work for Mr. Christopher.

Ques. Where did you last see that contract between Mr. Cook and Christopher? Ans. In the safe.

Ques. Where was your safe? Ans. In my office on Washington street.

Ques. When did you last see that safe? Ans. About two years ago in July.

Ques. Where did you leave it? Ans. In my office. I left the safe with Mr. Jenkins, and when he went to St. Louis, he left the safe in charge of Mr. King. He is out of town. I don't know where he is. He is a money broker when he can get a chance to shave; as near as we can find out, he had the safe sold, but the papers in it we can't hear anything of. I have had a gentleman looking some months to see if he can find the safe, to try and find where the safe is. It is a Lillie's safe.

Ques. What sort of a lock? Ans. The lock was fastened with figures.

Ques. You need not state the figures. Is it one that fastens with numbers? Ans. Yes; undoubtedly the contract, if any was in the safe, has been taken out. I don't know what has been done with the papers. He can probably explain it. I thought Mr. Marshall — (Objected to.)

Ques. *Mr. McAllister.* Explain about hunting a month for it? Ans. I said I had a gentleman looking over a month for my safe, for my books. He is in the room, and I believe is a man of truth and veracity.

Ques. *By Judge Scates.* Who is the man that hunted for the paper? Ans. Capt. Cleveland.

Ques. *By the Court.* Are you sure it is in the safe? Ans. I left it in the safe.

Ques. When did you last see it? Ans. It will be two years in July.

Ques. Is it with any other papers you recollect? Ans. Yes, sir; all my other papers; I have not seen them since.

Ques. Haven't you opened that safe within two years? Ans. No, sir.

Ques. Where does Mr. King live? Ans. I don't know.

Ques. What King is it? Ans. His name was Benjamin.

Ques. Did he sell out to Mr. King? Ans. No, sir; Mr. King sold out to somebody else.

Court adjourned.

*William B. Olmstead* recalled. Ques. Have you found that safe you were speaking of last evening? Ans. Yes, sir; we found the safe—it had been opened.

Ques. Did you find your papers? No, sir; the safe was sold at auction, last November, and the papers taken out by Mr. King, (Ben. King). I went to his boarding-house, and found he had gone out of town. I could not get access to his papers. I called on Dr. Hathaway, and every one I knew of, I had reason to suspect would know where they were, if there were any such papers there.

*Mr. Burgess.* We have made pretty thorough search; I have myself engaged in the search for these papers.

Mr. Burgess proposed to prove the contents of the contract alleged by this witness. (Objected to. Objection sustained by the court. Defendant's counsel excepted.)

*Carlton Drake* recalled by the Plaintiff. Ques. Did you hear Mr. Olmstead's testimony in regard to a conversation between him and Christopher and yourself? Ans. Yes, I did; between Mr. Christopher himself, and myself and Mr. Cook. I never had any conversation with the three, making myself the fourth, in my life. I never remember that I did with any two of them, outside of taking Mr. Cook through the building, to show him the work, have any conversation with Mr. Cook. I never knew anything about Mr. Christopher, or that he had any claim or interest in the matter.

Ques. Did you ever negotiate or contract, or undertake to do that work under Christopher? Ans. No, sir; never.

Ques. Is the fact so or not, that you knew otherwise than by what appears on the face of these orders, that Christopher had any pretense to a contract about it? Ans. Not that I know of.

Ques. Was the fact ever communicated to you by Mr. Cook, Mr. Christopher, or Mr. Olmstead? Ans. No, sir.

Ques. Do you state that the fact is not so? Ans. I should think it would not be so; I am quite certain. He was an irrespon-

sible man entirely. I do n't think I would have entered into an agreement to the amount of $500 or $600 without knowing his business character—knowing nothing of his financial character. He was a coppersmith on a small scale; he was not a man of means. I do n't suppose he was responsible for the value of ten cents; I supposed so; I did n't know anything further than appearances. I would not have undertaken a contract from him.

Ques. (Presenting order.) Did you see that order made and given? that certificate—that top paper? Ans. I called for it and received it myself. It was signed by Mr. Olmstead; filled out by Mr. Olmstead, and not as you find it there.

Judge Scates offered the paper in evidence. (Mr. Burgess objected, as it was not a matter for which Mr. Cook was shown to be responsible. Objection overruled. Defendant's counsel excepted.)

Certificate read as follows:

$400.              *Chicago, December 13th,* 1854.

I. Cook, Esq.: *This is to certify that there* is due to E. Hunt, for plumb work, *the sum of* four hundred dollars, *for labor and materials furnished your buildings,* on Young America, *as per contract, payable at sight at Chicago.*

           Yours respectfully,

No. 1.           VAN OSDELL & OLMSTEAD,
Couch's Block, Dearborn Street, Chicago.     *Architects and Superintendents.*

The remaining evidence is all in reference to Mr. Olmstead's character for truth and veracity. It is very voluminous, as a great many witnesses were called on both sides. The only question which arises under it is, whether a witness, called to sustain one who has been impeached, must first swear that he is acquainted with the general reputation, for truth and veracity, of the person impeached. The court decided that he must do so.

The plaintiff tendered the court, to be given to the jury, the following instructions, viz.:

1. If the jury believe, from the evidence, that the plaintiff, by his employees, furnished the materials and performed the work in question for the defendant in this suit, without any special contract therefor between plaintiff and defendant, but the defendant knowing that the same were furnished and done, as aforesaid, at the time the same were being furnished and done, received and used said work and materials, the law implies a promise on the part of the defendant to pay the plaintiff the fair value of such work and materials.

Given.

2. That if they believe, from the evidence, that defendant, Cook, made a contract with C. Christopher for the materials

and plumbing work on the Young America, yet if they also believe that the architect in charge and superintendence of the building requested plaintiff to do said work, and said plaintiff did perform said work and furnish said materials, with the knowledge and assent of defendant, and without any agreement with, or employment by, said Christopher, and without any knowledge of said contract with said Christopher, but for and on account of said Cook, then he is entitled to recover the value of said work and materials.

Given.

3. If the jury believe, from the evidence, that the plaintiff's account in question in this case was presented to the defendant, Cook, and that the defendant at that time requested the same to be made out in three separate accounts, and did not object otherwise to the same, these facts are competent and proper evidence for the jury to consider in determining the defendant's liability in this cause.

4. If the jury believe, from the evidence, that Olmstead, as superintendent of the work in question, ordered the plaintiff, by or through Drake, to do the work, and furnish the materials in question in this suit, and that the defendant, with knowledge of such facts and the circumstances, paid the plaintiff for a part of said work and materials, such payment, as aforesaid, is some evidence of a satisfaction, by Cook, of the acts of said Olmstead in ordering such work and materials, and the acts of said Olmstead in that behalf will be evidence tending to bind Cook, although the jury may also believe that Olmstead had no authority from Cook, at the time such order was given, to order said work.

All of which, the court gave to the jury, the last two without writing upon them or otherwise marking them in the margin, or elsewhere, " given," or " refused."

To the giving of which instructions, the defendant then and there objected, which was noted.

And the defendant tendered the court, to be given to the jury, the following instructions, which the court refused to give as asked, and amended them by inserting the words which are in italics, and in that condition marked them " given," and read them to the jury, which are as follows :

1. That if the jury believe, from the evidence, that the defendant made a contract with one Charles Christopher, to do the labor and furnish materials for the plumbing work in his building, the Young America. That the work specified in such contract was afterwards done by an arrangement between Christopher and Hunt. That Cook refused to recognize any person other than Christopher as the person with whom he had made

the contract for such work and labor, *and that the plaintiff had notice of such refusal*, and that after he so refused, the plaintiff went on and did the work and labor in controversy in this suit, and within the terms of the contract between Cook and Christopher, they must find for the defendant, unless they find that the plaintiff and defendant did expressly make a contract for the same.

Given.

2. That if the jury believe, from the evidence, that the labor and materials which are in controversy in this suit, were done and furnished by the plaintiff in fulfillment of a contract made between the defendant and Christopher, the defendant is not liable to Hunt, and they will find for the defendant, *if the plaintiff so understood it at the time.*

Given.

3. That if the jury believe, from the evidence in this cause, that the contract for doing the plumbing work on the Young America was not let to Hunt, *and that Hunt was not employed by Cook or his agent.* That Cook, after Hunt had done some plumbing work, refused to recognize him as contractor, and did to his, Hunt's, or that of his agent, Drake's, knowledge, recognize Christopher as the contractor for the work so done, and paid money upon the order of Christopher as contractor, to either of them for such work, then, unless an express contract is shown to have been made between Hunt and Cook afterwards, about the plumbing work, the mere fact that Hunt prosecuted and completed the job, will not *of itself* entitle him, Hunt, to recover, and they will find for the defendant, *especially if they believe that Hunt had notice that Christopher had a contract with Cook to do the same work, and they believe that Hunt did the work for Christopher, and not for Cook.*

Given.

To the refusing of which as tendered, and giving them as amended, by the court, the defendant then and there excepted, which was noted.

The defendant also tendered the following instructions for the jury, which the court refused to give, and marked them "refused," to wit:

"That if the jury believe, from the evidence, that a certificate from the architect in charge of the work, in favor of the plaintiff, as the contractor for a part of the work, labor and materials in controversy in this suit, was presented to the defendant, Cook, and he refused to pay it, and, afterwards, that was surrendered, and another certificate was taken in place of it, by Hunt or his agent, in favor of Christopher, as contractor, which was transferred by Christopher, and presented by Hunt or his

agent, to Cook, and paid by Cook to Hunt or his agent, that is conclusive evidence upon the parties, that the contract was originally between Cook and Christopher, and not between Cook and Hunt. That it is incumbent upon the plaintiff to show that an express contract was made between Cook and Hunt afterwards, in the absence of such proof, the law implying that the work was finished under the contract under which it was commenced, unless such proof of an express contract has been introduced, they will find for the defendant."

Refused.

"That the certificates, No. 1, date December 23rd, 1854, and No. 2, date June 11th, 1854, contains, upon its face, a notice to any person reading it, that the contract for the work for which it was given, was between Cook and Christopher, and that the one dated December 13th, 1854, recognizes Mr. Hunt as contractor, and that that, with the exception of the dates, is the only difference between the papers."

Refused.

W. T. BURGESS, for Appellant.

W. B. SCATES, for Appellee.

BREESE, J.　We think the evidence in this case can leave but little, if any doubt, that Hunt was the real contractor for the work for which he has recovered this judgment. Leaving out of view the testimony of Olmstead, the architect, which is contradicted by Drake, and his veracity shaken by a large number of witnesses ; and taking into consideration the fact that the appellant saw Hunt nearly every day at work at plumbing, inspected the work, and that Christopher worked in copper, and was not a plumber, and had the copper work to execute, we can arrive at no other conclusion than that Hunt was the contractor for the plumbing work.

The appellant insists that Hunt, by his own act, has barred himself from any such pretension. He insists that by a certain order, drawn by Olmstead on the appellant, in favor of Christopher, accepted and paid by the appellant, after he had refused to accept one drawn directly in favor of Hunt, is an estoppel upon Hunt, and that he cannot be now heard to say that the contract for doing the work was made with him.

The facts on this point are about these : The architect used printed forms of checks or orders, in which the contractor was described as plumber. On the 13th of December, 1854, the architect had filled up one of these certificates or orders, for four hundred dollars, payable to E. Hunt, the appellee, " for

plumb work," on "Young America," as per contract, payable at sight, at Chicago, which the appellant refused to pay, and it was returned to the architect, who said Cook was "notional," and that he would make it all right. Accordingly, he filled up another certificate, on the 23rd of the same month, to Christopher, as "plumber," which, being indorsed by Christopher to Drake, who was Hunt's foreman on the work, was paid by appellant. The architect swears that the plumbing work was let to Christopher, by a written contract, and that Hunt and Drake knew it, and took the job from Christopher; that they were sub-contractors under him.

This is hardly reconcileable with the architect's own act, for he made the first certificate, dated 13th December, in the name of E. Hunt, "for plumb work," and when it was returned unpaid, the only explanation he gives of Cook's refusal to pay, was, that he was "notional," not that Christopher was, and Hunt was not, the contractor for the work.

Drake, the foreman, swears, that no such reason was assigned by either Cook or the architect, for the refusal to pay the certificate. He swears positively, that the contract had been let to Hunt, and that neither he nor Hunt knew, or ever heard, of any contract with Christopher, and that Hunt was not a sub-contractor. This flat contradiction, by Drake, of the architect, Olmstead, coupled with the fact that his character for veracity was seriously impaired, to say the least, destroys any pretense of an estoppel *in pais*, by any act done by Hunt. The whole transaction seems like a plan to get some act of Hunt, by which the parties concerned might insist upon an estoppel, but it is easy to understand that Hunt, wholly unsuspicious of any such purpose, was willing to get his money through an order drawn in favor of any one, without scrutinizing the forms of the papers by means of which he was to get it.

Olmstead was the architect of this building, and the agent of appellant in its construction. His declarations and statements, therefore, as to all matters within the scope of his duties, were properly admissible in evidence. It was on his certificate, all payments were to be made. He received the bids for the work, and let a portion of it, and we recognize all declarations or statements of his, which the court suffered to go to the jury, as springing from the relation in which he stood to these parties.

By the testimony of Olmstead it would seem that the contract made with Christopher for the plumbing, was in writing. Its contents could not be proved, until its absence or loss had been fully and satisfactorily accounted for, which was not done in this case. The paper is traced to a safe in the keeping of a Mr.

King, but Mr. King is not produced and examined to give his knowledge of it.

The rule is well settled, that when a paper has a particular place of deposit, or when it is known to have been in a particular place, or in the hands of a particular person, then that place must be searched by the party setting up the loss, or the person produced or accounted for into whose hands or keeping it has been traced. *Doyle* v. *Wiley*, 15 Ill. R. 576 ; *Rankin* v. *Crow*, 19 ib. 626.

The statements made by Olmstead to his partner, Van Osdell, about Cook's paying him for his services — in fact, all his statements — were proper for the purpose avowed by the appellee's counsel, that is, to lay the foundation to impeach the witness. It is not only proper, but it is necessary for such purpose.

We cannot conceive that any payments made to Christopher, could affect Hunt, as their contracts were separate and distinct, and for different work. No inference could be drawn by the jury from the fact that he had paid Christopher, that, therefore, he had paid Hunt. Wilder's testimony was proper, as tending to fortify Drake's statement through admissions of the agent, Olmstead.

When a witness is impeached, and witnesses are called to sustain him, they are bound to swear that they know the general character of the impeached witness, for truth and veracity. If they cannot so swear, they cannot be heard on that point.

The instructions given by the court are all proper in a case of implied assumpsit, and though there may be some verbal inaccuracies, they substantially, taken together, declare the law.

As to those which the court neglected to mark as given or refused, as the statute requires, we have to say, this statute is directory to the court, and should be obeyed ; but if, in the hurry of business, it should not be, a party who is not in fault should not be prejudiced by it, if the record shows what was done with the instructions. If the law is correctly laid down in them, we do not think a court would be justified in reversing a judgment, because they were not marked " given."

The refusal to give the appellant's instructions, as moved by him, without the qualifications made by the court, was proper, inasmuch as without the qualifications, they were calculated to mislead the jury and work injustice.

We see no error in the record to justify a reversal of the judgment, and ordering a new trial. It appears to us justice has been done in the premises, and we must affirm the judgment.

*Judgment affirmed.*