JOHN R. DUFFIN

v.

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Mt. Vernon June 16, 1883.*

1. CRIMINAL LAW—*indictment for forgery—sufficiency.* A count in an indictment charging that the defendant did forge and counterfeit a certain forged and counterfeited paper writing, instead of alleging the forging and counterfeiting of a certain paper writing, merely, is sufficient, according to the precedents, and is good.

2. SAME—*where the signature alleged to have been forged is in German characters.* Where a person's name is forged to a note in German or Gothic characters, it is not necessary to allege in the indictment that the signature is in German, and give a translation. The rule of law that a document in a foreign language forged must be translated and explained by averments, has no application where the obligation is in the English language, and the name of the maker is written in the German script, when the name is written the same in both languages.

3. SAME—*proof of forgery of only one of several names—sufficient.* A conviction may be had under an indictment for the forgery of the names of three persons to a note, on proof of the forgery of the signature of either one of them.

4. SAME—*evidence of intent.* An indictment for forgery charged that the defendant had forged the names of certain persons to a note, payable to a certain bank, with intent to injure the bank. He obtained the money on the note from the bank. On the trial the defendant testified that his intent was to injure the bank, and not the persons whose names he used. It was *held,* that this was ample evidence of an intent to injure the bank.

5. SAME—*instruction as to reasonable doubt.* On the trial of one for the forgery of a note, the defendant testified that the signatures to the note were genuine, but that he procured them by artifice, fraud and deception, while the alleged makers denied that they ever signed the same. The defendant asked this instruction, which was refused: "The defendant in this case has testified. If the jury, having heard this testimony, and weighing it with the other evidence in the case, have a reasonable doubt that the statement of the defendant in regard to the making and signing of the note in controversy is or is not true, they must acquit him:" *Held,* properly refused, as calculated to mislead.

6. SAME—*one good count will sustain a general verdict.* If one count in an indictment is bad, and the others are good, a general verdict finding

8—107 ILL.

the defendant guilty will not be disturbed, and the objection to the defective count will not avail after such verdict.

7. SAME—*evidence—photograph copy of forged note.* A photographed copy of a forged note is admissible in evidence, where the original has so faded as to become illegible, on proof that it is an exact copy of the words of the original, when it is not offered to prove the handwriting of the signatures, but merely the words of the note. If material to show it is an exact similitude with the original in respect to form, shading and coloring, the testimony of an artist or expert might be required.

8. WITNESS—*credibility.* Where a defendant in an indictment, in his testimony shows a mind deliberately trained in wrong, and a conscience oblivious to a sense of justice, a jury may well disbelieve his evidence, when contradicted by other witnesses of undoubted veracity.

9. INSTRUCTION—*not read, treated as refused.* Where an instruction asked is neither marked given or refused, but is not permitted to be read to the jury, it is in effect refused.

10. EVIDENCE—*of its consideration by the jury—not in parts, but as a whole.* An instruction in a criminal case, that if the jury, taking the evidence for the prosecution, which they believe to be true beyond all reasonable doubt, and that for the defendant, which is not false beyond all reasonable doubt, can reconcile the same with any theory of innocence of the crime charged, it is their duty to acquit, was *held* rightfully refused. The jury is not required to take up and consider evidence in this order, but should consider the whole together, and determine its combined effect.

11. PRACTICE—*improper remarks of counsel.* On the trial of a person for forgery, the defendant addressed the jury, when one of his counsel openly stated, in the presence of the jury, that he withdrew from the case, and withdrew all he had said, and the State's attorney, in closing the argument, alluded to this, saying one of the counsel had wisely withdrawn: *Held,* that while the conduct of defendant's counsel, and his remarks, and those of the State's attorney, were highly improper and censurable, yet as the guilt of the defendant was not doubtful, and the punishment was not excessive, but was fully justified by the evidence, it furnished no ground for a reversal of the judgment.

WRIT OF ERROR to the Circuit Court of St. Clair county; the Hon. AMOS WATTS, Judge, presiding.

This was an indictment against John R. Duffin, *alias* Hamlet S. Felton, for forgery.

After a verdict of conviction the defendant entered his motion for a new trial, and in support of some of the grounds

of his application presented an affidavit alleging certain mis-conduct on the part of one of his counsel during the trial in the court below. The affidavit sets forth, substantially, that the counsel referred to undertook to address the jury while in an intoxicated condition, and that thereupon the defendant, himself an attorney, proceeded to address the jury in his own behalf, when he was interrupted by his counsel of whose con-duct he complains, such counsel being still in an intoxicated condition, and who appeared at the rail of the jury box, and without asking permission from the court, or other prelimi-nary, and in an excited manner, faced the jury, and address-ing them, spoke as follows, to-wit: "Gentlemen, I want it distinctly understood that if Mr. Felton is going to argue his own case I withdraw all that I have said and done for him in this case. What I have said don't count,—I want that understood, gentlemen." At this point, Mr. E. L. Thomas, the other attorney for the defendant, rose and resisted the interruption, and stated to the court that he held it to be the constitutional right of his client to speak in his own defence. Then followed an unseemly scene, which was finally stopped by the court promptly informing the offending counsel that he had a perfect right to withdraw from the case and be silent.

The said defendant further says, that neither he nor his attorney, E. L. Thomas, or any agent of theirs, either agreed to or procured, or colluded with the said associate counsel to procure, him to do what he did in withdrawing from the case, but, on the contrary, that they did everything in their power to prevent him from doing what he did, and from uttering the words set out above.

The defendant further says, that this unexpected blow, coming, as it did, from his own attorney, and at the time and place described, unnerved and confused him, the defend-ant, and greatly impaired his ability to argue his case, and therefore injured his defence. And said defendant further

says, that he believes that the remarks of his counsel, given above, to, and his conduct before, the jury, as set out above, greatly prejudiced the minds of the jury against him, the defendant.

The defendant further says, that when his counsel, E. L. Thomas, had advanced to the rail of the jury box to read his instructions to the jury, in obedience to the order of the court, the said associate counsel, still intoxicated, confronted the said E. L. Thomas, and in the presence and hearing of the jury demanded that the instructions be not read, saying, "I wrote those instructions, all of them, and they don't count in this case." Mr. E. L. Thomas informed him that the instructions had been passed on by the court, and that we did not have time now to write others. This unseemly scene took place in the presence and hearing of the jury, and was allowed by the court; but the defendant does not know that the court was aware of the controversy at the time it occurred.

The defendant further says, that while the instructions were being read by E. L. Thomas, the said associate counsel sat near the defendant, in the hearing and presence of the jury, and abused the defendant, by saying: "You are a God damned fool. You ought to be convicted, and sent up for forty years. I had you acquitted, God damn you, and you convicted yourself. You think you are sharp, don't you? You are a God damned ass. I wrote all them instructions, and they don't count," etc. The defendant says that this occurred after the said counsel had withdrawn from the case; that the defendant could not prevent it, and that it was allowed by the court, though the court may not have been aware that the said counsel was so abusing the defendant, and the defendant was in no condition to defend himself, for that at the time his *only* attorney was engaged in reading his instructions to the jury.

The defendant further says, that Mr. Charles Knispel, in closing the argument for the prosecution, commented on

matters not in evidence, and not admissible in evidence,
and said, in referring to the unseemly withdrawal of one of
the counsel from the defence : "Gentlemen," (addressing the
jury,) "you have seen yourselves that the leading attorney on
the other side wisely withdrew from the case, for he knew that
it was hopeless." And he shortly afterwards said : "Now,
gentlemen, if, after that, you have a doubt as to the prisoner's
guilt, you have a doubt that is not shared in by any man on
this floor," (referring to the bystanders in the court room.)
This language was promptly objected and excepted to by the
defendant's counsel.

The defendant further says, that neither his counsel, E. L.
Thomas, Esq., nor he, Felton, nor any other person with
their knowledge or consent, had any part in procuring the
intoxication of the said associate counsel, or in procuring him
to say or do any of the things set out above, but on the con-
trary, that they, the said Thomas and Felton, did all in their
power to prevent the occurrences aforesaid, and that they (the
matters set out) were allowed by the court, although, as said,
the court may not have been aware of the occurrences at the
time they occurred.

Mr. EDWARD L. THOMAS, for the plaintiff in error.

Mr. R. D. W. HOLDER, State's attorney, and Mr. JAMES
McCARTNEY, Attorney General, for the People.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court :

The indictment under which plaintiff in error was con-
victed contains five counts, charging, in varying language,
in some, the forging, and in the others, the uttering, and
publishing as well, of an instrument, of which the following
is a copy :

"$4106$\frac{70}{100}$.          Belleville, Ill., *April 12th, 1880.*

"Four months (without grace) after date we, or either of us, promise to pay to the First National Bank of Belleville, or order, the sum of four thousand one hundred and six $\frac{70}{100}$ dollars, for value received, with eight per cent interest per annum from maturity, at the office of the First National Bank of Belleville.

Jakob Schmidt,

Julius Winkler,

Wm. R. Padfield."

A general motion to quash the several counts was made by plaintiff in error, and overruled by the court, and this is the first error alleged in the ruling to which our attention is invited by the printed argument in behalf of plaintiff in error. The contention is, that the indictment charges, in each count, the forging of the name of Jacob Schmidt, and the copy of the note set out in each count shows the name to have been written in German; but since there is no allegation that the name of Jacob Schmidt was signed in German, each count is, upon its face, defective. In support of this, reference is made to Wharton on Crim. Pleading and Practice, (8th ed.) sec. 181, and Wharton on Crim. Law, (8th ed.) sec. 729. The references are hardly pertinent. They show that an *instrument* in a foreign language must be translated and explained by averments in the indictment. But there is no pretense that the *instrument* here charged to have been forged is in the German language. The name of Jacob Schmidt is simply written in Gothic instead of Roman characters, and when written in the one it is not made to appear it is in anywise different from what it is when written in the other.

A special objection to the third count is urged, in that it charges that plaintiff in error did "forge and counterfeit a certain forged and counterfeited paper writing," whereas it ought to have charged the forging and counterfeiting of a

paper writing, etc., merely. We perceive no inaccuracy in the language of the count. The result of forging and counterfeiting is, certainly, a forged and counterfeited paper writing. The words "forged" and "counterfeited," as used, are simply equivalent to saying plaintiff in error made or fabricated a false and counterfeited paper writing, by the process of forging and counterfeiting. The count is in the language of the old precedents. (1 Wharton on Precedents and Pleas, (4th ed.) No. 293. See, also, the form of indictment in *The People* v. *Kingsley*, 2 Cowen, 522.) But even if the count were bad, since the verdict is general, and the other counts are good, the objection would be unavailing. *Townsend* v. *The People*, 3 Scam. 326; *Holliday* v. *The People*, 4 Gilm. 111; *Sahlinger et al.* v. *The People*, 102 Ill. 241; *Murphy* v. *The People*, 104 id. 528.

On the trial, the prosecution offered in evidence the promissory note alleged to have been forged, and a photographed copy thereof. Plaintiff in error objected, first, that the name of Jacob Schmidt was in a foreign language; and second, that the process of taking the photographed copy had not been proved by an artist in that line. Both objections were overruled by the court, and the offered evidence was given to the jury. This ruling constitutes the second error claimed, in the argument on behalf of plaintiff in error, to have occurred to his prejudice.

If what has been said in regard to the name of Jacob Schmidt, in discussing the motion to quash the indictment, is correct, it must follow the objection that his name was written in a foreign language is untenable. The name is simply "Jacob Schmidt," written in characters that are understood as representing J-a-k-o-b S-c-h-m-i-d-t.

If the purpose of introducing the photographed copy in evidence had been to have proven the forgery by a comparison of handwritings, there would have been much more force than there is in the objection in that regard; but there was

no such purpose or use. The officers of the bank, observing that the ink in which the note was written was rapidly fading, had the note photographed, and this copy was offered in evidence simply to prove the words of the original, and not the peculiarity of handwriting. Since the taking of that photograph the original has faded so that it has become illegible, or practically so. Under these circumstances we think there can be no doubt parol evidence of what the original note was would have been competent evidence, and most certainly a compared copy would, though there had been no attempt, in making it, to imitate the handwriting of the original. An artist may be required to determine whether the letters of a professed copy are an exact similitude as to form, shading and coloring of those of the original, where that is material; but inasmuch as the words may be the same, though the form, shading and coloring of the letters are different, it can not be indispensable to have a photographic artist where the sameness of the *words* in a copy with those in the original is alone to be proved. We think the proof of the copy here was clearly competent. The cashier of the bank ought to have been, and we presume was, able to tell just as well as the best photographer whether the *words* in the copy were the same as the *words* in the original.

The next contention of plaintiff in error is, that the evidence does not sustain the verdict. Each of the three purported makers of this promissory note swears, positively and unqualifiedly, that he did not sign it. Plaintiff in error admits they did not sign it knowing what it was, but insists, nevertheless, their signatures are genuine, and that they do not explicitly deny that they are genuine. He admits, and testifies, that he presented this promissory note to the bank and obtained $4000 thereon, which he appropriated to his own use, and that neither of the purported makers of the note signed it knowingly or intentionally, but, he says, by artifice and deception he obtained each of their genuine sig-

natures thereto; that he obtained Winkler's under pretext of having him sign a duplicate release of a mortgage; that he obtained Schmidt's by pretending to have him sign an attachment bond, and that he obtained Padfield's by having him sign what Padfield supposed to be a receipt; that in each case he artfully substituted the note for that which they were requested to sign and supposed they were signing when they wrote their names, without attracting their attention. He says he made an ink that he knew would rapidly fade, with which he wrote or rather filled up the note, and in which each of the parties wrote his name; that he did this in order that the note might become illegible before maturity, and the loss, therefore, fall on the bank rather than on the purported makers of the note. We think the purported makers of the note do each deny, in their evidence, the genuineness of their signatures, as well as the fact that they ever signed such a note. Schmidt, in answer to the question, "Did you sign this note?" answered, "No sir, I never did. I never signed any such note as that, for Felton or any body else. I never put my name there." And he positively denied the occurrence of the circumstances under which plaintiff in error testified he obtained his signature. He testified that he had never in his life signed more than one paper at the request or in the presence of plaintiff in error, and that was a contract between himself and James M. Padfield. Winkler testified: "I never signed any note payable to the First National Bank. I never signed this note." And he also positively denied the occurrences detailed by plaintiff in error as those under which he obtained Winkler's signature. He testified that he never signed any paper at the request or in the presence of the plaintiff in error, which went into the custody of plaintiff in error. Padfield testified: "The signature on that note is not mine. It is a pretty good imitation."

There were other circumstances before the jury strongly tending to prove the guilt of the plaintiff in error,—such as,

when first arrested, denying his name, and afterwards admitting his guilt. Undoubtedly some circumstances were proved, tending, though, as we think, but slightly, to corroborate the testimony of plaintiff in error; but the weight and effect of these were, properly, questions peculiarly for the jury,—and we can not say they clearly erred in their duty in this respect. The shameless defence interposed, indicates, in itself, a mind deliberately trained in wrong, and a conscience oblivious of a sense of justice. One who can, with exultation, as plaintiff in error seems to, tell such a story as he does, would not likely hesitate to screen himself, to the extent he could, behind false statements, and a jury can not be censured for disbelieving such an one when contradicted by other witnesses of unsuspected veracity.

The next point contended for by counsel for plaintiff in error is, the court erred in refusing certain instructions asked on his behalf. One of these reads thus:

"The defendant in this case has testified. If the jury, having heard this testimony, and weighing it with the other evidence in the case, has a reasonable doubt that the statement of the defendant in regard to the making and signing of the note in controversy is or is not true, they must acquit him."

This was very properly refused. At best it could only have confused the minds of the jurors, and misled them from the true point of inquiry. In other instructions asked by plaintiff in error, and given by the court, the jury were fully instructed as to the doctrine of reasonable doubt, and nothing more on that subject was necessary.

Another instruction was neither marked "given" or "refused," but was not permitted to be read to the jury. This was, in effect, its refusal. (*Cook* v. *Hunt*, 24 Ill. 535; *McKenzie* v. *Remington*, 79 id. 388.) The instruction was artfully framed to mislead the jury, and was properly refused. It reads thus:

"The court instructs the jury, that if the jury, taking the evidence for the prosecution, which they believe to be true beyond all reasonable doubt, and that for the defendant, which is not false beyond all reasonable doubt, can reconcile the same with any theory of innocence of the crime charged in the indictment, it is their duty to acquit the prisoner."

No rule of law requires the jury, in considering of their verdict, to take up and consider the evidence in this order. All the evidence is to be fully and fairly considered, and when thus considered the jury are to determine, is the defendant proved, beyond a reasonable doubt, to be guilty as charged in the indictment. But often evidence which, in and of itself, when considered alone, is inconclusive or but probable evidence, when considered in connection with other evidence becomes of great probative force. The effect of every part of the evidence upon and in connection with every other part is to be considered, for, in this way, not infrequently the correctness of the different parts, or the reverse, is demonstrated, and the combined result of all can in no other way be ascertained.

In two other instructions refused the court were asked to instruct the jury that they should acquit if the jury had a reasonable doubt whether either one of the purported makers signed the note. This is not the law. If either signature was proved to have been forged, the offence charged was made out. 1 Wharton on Crim. Law, (8th ed.) secs. 677, 678.

The other instructions refused were properly refused, because the principle attempted to be asserted was embraced by instructions previously given.

Some point is made in argument on the alleged insufficiency of the proof to show that the intention was to injure the bank, as charged in the indictment. Plaintiff in error testified the intent was to injure the bank, and he also testified that he obtained the money from the bank on the note.

This was ample evidence of an intent to injure the bank. See Wharton on Crim. Law, (8th ed.) sec. 713.

The last objection that we deem it important to notice is, it is claimed plaintiff in error was seriously prejudiced before the jury by certain language and conduct of one of his own attorneys, (detailed at length in an affidavit filed in support of his motion for a new trial,) who became intoxicated, and withdrew from the defence while the case was being finally argued, and also by the allusion to that attorney's withdrawal from the defence by the attorney making the closing speech on behalf of the prosecution. If the guilt of the plaintiff in error were doubtful, or if the punishment imposed might be regarded as excessive, we are not prepared to say that we would not hold the case should be reversed for the language and conduct of the attorney as recited, (its truth being shown by the bill of exceptions,) in connection with this improper allusion of the attorney for the prosecution; but in our opinion, under the proofs preserved in the record, the guilt of the plaintiff in error is not doubtful, and the punishment imposed upon him is not excessive, and so it must result that the language and conduct of the defendant's attorney, and the allusion of the attorney for the prosecution complained of, produced no improper result. It would, indeed, have been matter of astonishment, if, under all the proofs recited in this record, the jury had found plaintiff in error not guilty, and there are no circumstances of extenuation or mitigation in proof. By his own showing he was possessed of a liberal education, and was licensed to practice the law. No impediment to a successful, honorable career, save his dishonesty, barred his way. It does not even appear that he was impelled by any present need of money. With more than ordinary deliberation, as is apparent from his own testimony, he abandoned a career of honesty for one of crime. His education and his professional connection made him much more dangerous to society than he would

have been if he had not enjoyed those advantages. It is, under all the circumstances proved, eminently proper that a punishment should be imposed that may make his case an example to deter others, in like situation, who·may be tempted to sin as he did. If the language and conduct of defendant's attorney was as disclosed in the affidavit of plaintiff in error, it was a gross breach of professional duty, and a serious contempt of court, and the attorney should have been promptly and severely punished; but it rested with the trial judge to inflict that punishment, or mercifully to pass it by without notice, and that he did the latter is no ground of error here. It is enough for the present that the conduct of that attorney, however censurable, did not, in our opinion, improperly affect the action of the jury.

The judgment is affirmed.

*Judgment affirmed.*