No. 2-08-0915    Filed: 12-22-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 07--CF--151 |
| SIRENIO FLORES, | ) ) ) | Honorable Thomas E. Mueller, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the opinion of the court:

Defendant, Sirenio Flores, appeals from his ninth conviction of driving with a revoked or suspended license (625 ILCS 5/11--501.1 (West 2006)). He asserts that the trial court improperly admitted as self-authenticating a videotape produced by a neighbor with admitted animus toward him. We agree with defendant, although we conclude that a more accurate characterization of the error is that the court treated the videotape as substantive evidence when the foundation would allow only its demonstrative use. We therefore reverse defendant's conviction and remand the matter for a new trial.

I. BACKGROUND

Defendant was charged by indictment with the traffic offense we have described. According to the indictment, the offense took place on September 22, 2006.

Salvatore Morici was the State's first witness at defendant's bench trial. He testified that he lived on the same block as defendant. They did not like each other. On September 22, 2006, he was driving down a road when a vehicle swerved into his lane, so that it was heading straight toward him, forcing him onto the unpaved shoulder. The driver "flipped the finger" at him. He recognized the driver, who was alone in the vehicle, as defendant.

When traffic cleared, Morici turned his vehicle around and tried to follow defendant's vehicle, a white minivan. The next time he saw the van, it was again coming toward him. Morici had a "camcorder" in his vehicle because he had been making a recording of his grandmother's property as an insurance record. When he saw the van coming toward him again, he got out the camcorder and started taping. He taped defendant as defendant pulled to the side of the road and got out of the van. At trial the State showed Morici a tape, which he said was a copy of the tape from his camcorder. He agreed that he had reviewed that copy and that it accurately depicted what he had seen after he turned on the camcorder.

Morici said that, when he saw defendant for the second time, he called the police. He spoke to them at the house at which defendant had stopped and later that day he took his camcorder to the police department, where an officer watched the tape through the camcorder's viewfinder. Because he did not want the police to have the part of the tape with "personal information," he did not give them the tape then.

The State asked to show the tape, and the court allowed it over defendant's objection that the foundation was insufficient. Watching the tape, Morici said that a person on the tape in white pants and a blue sweatshirt was defendant. He agreed that the tape contained a skip; this was because he had set the recorder down and shut it off after defendant had left the van and gone into the house.

We reviewed the tape. It starts with a brief section of static, momentarily flashes to something colorful, and then starts with a very shaky view of a white van. The whole tape is perhaps five minutes long. In the lower right corner is a date (but not time) stamp.

At trial, Morici admitted to a history of bad blood between himself and defendant. Sometime in 2005, Morici hired defendant, a painter, to paint the upstairs of his house, and Morici believed that defendant did not complete the job. In March 2006, the police were called to the scene of a physical altercation between Morici and defendant when the two had a confrontation over checks that Morici had cashed for defendant. After the events of September 22, 2006, there had been other incidents with defendant--"so many" that Morici could not recall them all. These included an incident in which defendant told the police that Morici had attacked defendant at an Oswego school.

Morici testified that, to the best of his recollection, the date stamp was visible on the tape when he showed it to the officer on the 22nd. He said that he did not own video editing equipment, but had made a copy of the tape by connecting the camcorder to his VCR. He gave the following responses when cross-examined about how he made the copy and whether he retained the original:

"Q. [Defense counsel:] When you got home [from taking the tape to the police station], you went through a process by which you made either a copy or erased some other material to give to the officer; is that correct?

A. [Morici:] No. I did not erase some of the material. I made a copy of the physical tape.

Q. You have video editing equipment at home, do you not?

A. No, I do not.

* * *

Q. So you have two VCRs one to the other, is that how you did it?

A. No. You plug in a cord from your camcorder to a VCR.

* * *

Q. If we were to play the rest of the tape, we would see the footage of the grandmother's possessions?

A. No, no longer you wouldn't.

Q. Why wouldn't that be if you're making a straight copy?

A. Because I erased that information because it's on that tape because it had personal information. We continued video recording because it had to go to the insurance company for the move for all her personal Hummels.

Q. So you can erase--after making a straight copy, you can erase some other information?

A. After you make a copy, any tape recorder, anything can be erased.

Q. So you're saying you erased those portions on the copy you gave to the officers?

A. No. I erased the portions off my tape that came from the VCR from the camcorder.

Q. The copy of the video tape that you gave to the officers is not the same exact copy of the video that was in your video camera when you filmed?

A. Yes, it is.

Q. You said yourself that you erased portions of that video tape so that your grandmother's items wouldn't actually be on there?

A. The actual physical tape is approximately that big that fits into a camcorder, is approximately this big, and you download any information from that tape into an actual VCR size because it is a smaller tape. Once you download that information from your camcorder to the tape, you have the option therefore to erase what's on your original tape from your camcorder. But once you download it onto that, you can't edit or erase or anything because it's actually recorded right off the original tape.

Q. What you're telling me is that you erased some portions of the same video tape that contained Mr. Flores' driving and your grandmother's possessions?

A. No, I did not. I erased the original tape that was in my camcorder after I downloaded it to that tape. We erased that because I wasn't going to give an insurance company a video tape of personal possessions and then go into an incident like this thing back into personal possessions.

* * *

Q. So the copy that you gave to the police, if it was an exact copy of the original video tape in your camera, would presumably also contain, in addition to Mr. Flores, the depiction of Mr. Flores' driving allegedly, those portions of your grandmother's footage of the possessions that she had for insurance purposes; isn't that correct?

A. They viewed the same exact tape. They only wanted to view the information that was the tape that was from this incident. So, yes, it is the same tape that was in the camcorder that was transferred over to the VHS cassette but they only wanted those images."

Morici gave no other explanation of how he produced the evidence tape.

Officer Richard Meszaros of the Plainfield police testified that he was dispatched to a house in Plainfield on September 22, 2006. There, he spoke to Morici, who pointed out defendant. He verified that defendant's license was suspended. Morici came to the police department, and Meszaros watched a tape that, to the best of his recollection, matched the State's tape. He did not get a copy of the tape until 10 or 12 days later. His original report, written after viewing the tape with Morici, said that the tape had no time stamp, but the evidence tape did have one. He said that, having reviewed the tape, he could not positively identify defendant as the person depicted. (On redirect, he said that the person was dressed similarly to how defendant had been later that day, although he thought the sweatshirt was different.) When he watched the tape with Morici on the 22nd, the only part he saw related to defendant's driving. Also, he had previously responded to a report of an altercation between defendant and Morici.

After Meszaros's testimony, the State rested. The State then discovered that it had never moved for admission of the tape. It then asked to reopen evidence for the sole purpose of admitting the tape. The court allowed it to do so. Defendant objected to the foundation, saying that conflicting evidence existed as to the condition of the tape--that is, the time stamp.

Defendant's first witness was Joanne Wheaton. She was a neighbor and friend of defendant's and, on the 22nd, she employed him to do painting and dry-walling in her basement. Defendant had an employee working with him. Wheaton was in the house all day that day and did not think that defendant had gone outside alone. At 8 or 9 a.m., she drove him in his van to try to deposit a check. The court questioned Wheaton, who said that she parked defendant's van in her driveway. She said that she and defendant later asked defendant's employee to drive the van into the garage; they were worried about what Morici was doing outside the house.

Defendant also testified. He said that he had not driven that day; his employee had driven his van to Wheaton's. He and his employees had standard uniforms of white pants and blue sweatshirts. He described a history of problems with Morici--"plenty of incidents, but we could be here forever." He admitted that the tape depicted Wheaton's house and that his license had been suspended since 1996.

Morici testified in rebuttal. The camcorder was admitted into evidence to show what looking through the viewfinder was like. In closing argument, the State argued that the tape "spoke for itself." The trial concluded on May 27, 2008, and the court said that it would issue a written decision.

That decision came on May 30, 2008; the court found defendant guilty:

"[T]he court finds that the videotape evidence as corroborated by the testimony of Ms. Wheaton is sufficient for a finding that the State has met its burden of proof herein and the defendant is found GUILTY. The court specifically finds that the hostilities between the defendant and the State's witness, Sal Morici, are irrelevant to the court's findings herein based upon the independent testimony of Ms. Wheaton and the clear depiction contained within the videotape."

Sentencing took place on July 20, 2008. The court noted that the relevant statute required it to sentence defendant to at least 180 days' incarceration. It noted concern for defendant's dependents, but also noted that other courts had given defendant "gifts" in punishing earlier violations. It said that defendant's actual incarceration would be the same whether it sentenced him to 180 days in jail as a condition of probation or sent him to the Department of Corrections for 18 months; it sentenced him to 18 months' imprisonment.

Defendant filed a motion for a new trial on July 28, 2008, which the State moved to strike as untimely. Defendant explained that he had not received the court's written finding of guilt and had learned of it only through checking the record. The court said that the clerk had sent the order properly and, further, that counsel should have learned of it through defendant when the probation office called defendant to participate in preparation of the presentencing report. In his motion, defendant objected to the late admission of the videotape and asserted that Morici's testimony was so biased as to be incredible. However, the court granted the State's motion to strike defendant's motion. Also on July 28, 2008, defendant filed a generic motion to reconsider the sentence. The court denied this motion on September 26, 2008, saying that it might have imposed the maximum sentence, but was concerned for his dependents. Defendant timely appealed.

On appeal, he characterizes the trial court as having improperly treated the tape as self-authenticating. The State argues that the foundation was sufficient.[1] We hold that the trial court erred in admitting the tape as substantive evidence, but that retrial is not precluded.

## II. ANALYSIS

The court, in its written decision, "specifically [found] that the hostilities between the defendant and the State's witness, Sal Morici, [were] irrelevant to the court's findings *** based upon the independent testimony of Ms. Wheaton [that is, some corroboration of details of time and place] and the clear depiction contained within the videotape." The court, by this wording, unambiguously

---

[1]We note that the State has not argued that defendant forfeited this argument by failing to properly raise it in a posttrial motion. The State has forfeited the forfeiture argument. People v. McKown, 236 Ill. 2d 278, 308 (2010); People v. Harris, 228 Ill. 2d 222, 229-30 (2008).

stated that it did not treat the tape simply as illustrative of Morici's testimony, but rather as independent, substantive evidence of the events of September 22, 2006. Illinois law has traditionally restricted videotapes and other visual recordings use as demonstrative evidence, that is, use as illustrations of witnesses' testimony. The cases that relax that rule are all relatively recent. They tell us that visual recordings, when treated substantively, are real evidence requiring a proper foundation, including evidence that the proposed exhibit is substantially unaltered. People v. Taylor, 398 Ill. App. 3d 74, 87 (2010). That evidence was not present here.

The foundation that Morici provided for the tape's introduction satisfied the requirements for the court to admit it as demonstrative evidence. The foundation for the admission of a visual recording as demonstrative evidence need show only that the proposed exhibit matches a witness's recollection:

"A sufficient foundation is laid for a still photograph, a motion picture, or a videotape by testimony of any person with personal knowledge of the photographed object at a time relevant to the issues that the photograph is a fair and accurate representation of the object at that time[.]" (Emphasis in original.) M. Graham, Cleary & Graham's Handbook of Illinois Evidence §401.8, at 135 (8th ed. 2004).

Morici's videotape was admissible as demonstrative evidence, as he testified that the tape truly and accurately depicted what he observed on September 22, 2006. (The fact that Morici's tape had been edited would go to its weight and not to its admissibility as demonstrative evidence. 2 R. Hunter, Trial Handbook for Illinois Lawyers--Criminal §58:7 (8th ed. 2002).) The difficulty arises out of the trial court's decision to use the videotape as evidence independent of the testimony. That decision, as we will explain, amounted to treating the tape as substantive evidence, despite the lack

of a proper foundation. Defendant's argument that the court treated the tape as self-authenticating is a fair description of the problem.

In Taylor, this court required a chain of custody as part of the "silent witness" foundation (foundation for a recording when there is no party to testify to the accuracy of the recording) for introducing an unmanned surveillance video, because we recognized that a visual recording, particularly in a digital format, is susceptible to editing and "outright fakery." Taylor, 398 Ill. App. 3d at 93. This case presents the same concern. Because the foundation for admission of visual recordings as demonstrative evidence is inadequate to ensure their reliability as substantive evidence, it is necessary to articulate a foundation for their admission as substantive evidence. When we say "visual recording," we mean either analog or digital still photographs, motion pictures, or videos.

We begin by observing that Illinois law recognizes a distinction between demonstrative and other evidence, variously described as "real," "probative," or "substantive." "Demonstrative evidence has no probative value in itself. It serves, rather, as a visual aid to the jury in comprehending the verbal testimony of a witness." Cisarik v. Palos Community Hospital, 144 Ill. 2d 339, 341 (1991). In Illinois, the use of visual recordings as anything but demonstrative evidence is a rarity.

Photographs have been admissible evidence at least since 1883, when the supreme court held that a photograph of a note, identified by a bank clerk as correctly representing the words of the note, was admissible to show the words, but not the similitude of the handwriting, on the note. Duffin v. People, 107 Ill. 113, 119-20 (1883). In Duffin, the defendant was charged, inter alia, with forgery, and the prosecution offered in evidence both the promissory note alleged to have been forged and a photographed copy of it. Duffin, 107 Ill. at 119. When the bank officers noticed that the ink on the original note was fading, they had the note photographed. Duffin, 107 Ill. at 120. After the

photograph was taken, the original faded so that the writing became illegible, and the court held that the photographic copy was the same as parol evidence of the words on the note. Duffin, 107 Ill. at 120. The court noted that the photograph was not introduced to prove the forgery by a comparison of handwritings; in other words, it was not introduced as substantive evidence. Duffin, 107 Ill. at 119. However, the court did not opine that the photograph would have been inadmissible as substantive evidence, only that "there was no such purpose or use." Duffin, 107 Ill. at 119-20.

The holding in Lake Erie & Western R.R. Co. v. Wilson, 189 Ill. 89, 95-96 (1901), illustrates our courts' early approach to visual recordings:

"The general rule is, that photographs stand on the same footing as a diagram, map, plan or model, and that a photograph is a legitimate mode of proving a condition which can be shown by a representation of that sort. It rests, to some extent, upon the credit of witnesses, in the same way as a map, plat or plan; but that fact furnishes no reason for excluding it as evidence. [Citation.] *** The preliminary proof of the correctness of the picture, the ability of the operator and the accuracy of the instrument is addressed to the court, and it is not error to exclude photographs taken a long time after an accident, where the situation has been changed and the operator is shown to be inexperienced. [Citation.] In this case the preliminary proof was full and complete, and the photographs are in the record and show a perfectly natural representation of railroad tracks and surroundings. There was nothing in the evidence nor in the photographs themselves tending to discredit their accuracy. Under such conditions, photographs of things which cannot be produced in court as evidence are generally admissible in evidence, the same as a map or plan. [Citation.] *** In this case the photographs were an important means of proving the condition of the track, and, under

the circumstances, we think the defendant had a right to have the jury see them in connection with the other evidence, and it was error to exclude them."

Two points are notable in this decision. The first is the requirement of some authentication of the photograph--"the correctness of the picture, the ability of the operator and the accuracy of the instrument." Wilson, 189 Ill. at 96. The second is the characterization of photographs as equivalent to diagrams, maps, plans, models, and plats. Only the second remained a part of Illinois law. While the Wilson court spoke in terms of the photographs "proving" the condition of the track, it also made the photographs subject to the credibility of testimony, which indicates a demonstrative use of the photographs.

Following on the tradition marked by Wilson, a characteristic decision from the middle of the last century held:

"Photographs *** are not evidence in themselves, but are allowed for the purpose of enabling the jury to understand and apply the testimony. [Citation.] Photographs stand on the same footing as a diagram, map, plan or model, and a photograph is a legitimate mode of proving conditions ***." Foster v. Bilbruck, 20 Ill. App. 2d 173, 183 (1959).

However, unlike the Wilson court, the Foster court did not require any evidence of how the photographs at issue had been produced. It admitted them on a news photographer's testimony that he had taken them on the day of the accident that was the suit's subject and a highway patrol officer's testimony that they accurately represented the scene. Foster, 20 Ill. App. 2d at 183-84.

In contrast to the Foster court, our supreme court treated photographs as substantive evidence in People v. Speck, 41 Ill. 2d 177, 203 (1968) (holding that the photographs helped to establish the degree of force used by the killer), and in People v. Morgan, 142 Ill. 2d 410, 461-62

(1991) (to prove part of the corpus delicti of the murder). In People v. Smith, 152 Ill. 2d 229, 263 (1992), our supreme court came out and said that "[p]hotographs, like any evidence, may be admitted into evidence when authenticated and relevant either to illustrate or corroborate the testimony of a witness, or to act as probative or real evidence of what the photograph depicts." Having made it clear that visual recordings can be substantive evidence, the court did not opine on the necessary foundation for admitting them as such. Indeed, commentators recognizing that visual recordings could be admitted as substantive evidence have presented the foundation requirement that visual recordings accurately depict that which they purport to depict as applying across the board. 2 R. Hunter, Trial Handbook for Illinois Lawyers--Criminal §58:7 (8th ed. 2002); M. Graham, Handbook of Illinois Evidence §401.8 (8th ed. 2004).

Yet this foundation is inadequate for admitting a visual recording as substantive evidence where no witness was available to testify that the visual recording was a true and accurate depiction of what it purported to depict. The seminal case in this regard is United States v. Taylor, 530 F.2d 639, 641-42 (5th Cir. 1976). The case concerned photographs taken by an automatic still camera in a bank. The security system caused the camera to start taking photographs only after a robber locked the employees in the vault, so that no witnesses were available to testify that the photographs were accurate. The prosecution presented testimony "as to the manner in which the film was installed in the camera, how the camera was activated, the fact that the film was removed immediately after the robbery, the chain of its possession, and the fact that it was properly developed and contact prints made from it." Taylor, 530 F.2d at 642. The Court of Appeals held that "such testimony furnished sufficient authentication for the admission of the contact prints into evidence." Taylor, 530 F.2d at 642. The Third District of our Appellate Court adopted this "silent witness" theory as a means for

authenticating visual recordings under similar circumstances in People v. Vaden, 336 Ill. App. 3d 893, 898 (2003). This court followed Vaden in our Taylor decision. Taylor, 398 Ill. App. 3d at 86.

Our decision in Taylor is instructive in resolving the issue of the proper foundation for the introduction of Morici's videotape as substantive evidence, because it clarified that the risk of modification, manipulation, and fabrication of images is present even when a live witness is available to testify to the condition of the item, and because there, as here, a copy of a videotape rather than the original was introduced. In Taylor, the defendant, who was charged with theft of property worth less than $300, moved to bar introduction of a videotape that apparently showed him taking the property. A police officer had purchased digital video equipment and placed it in a clock radio in the victim's office. Taylor, 398 Ill. App. 3d at 77. The camera sent a wireless signal to a wireless transmitter, which was connected to a digital video recorder (DVR) that recorded the images from the camera. Taylor, 398 Ill. App. 3d at 77. The camera had a motion sensor so that an object moving in front of it started the recording process. Taylor, 398 Ill. App. 3d at 77. At trial, the State introduced a copy of the recording from the DVR. In holding that it was error to admit the recording into evidence, we held that the requirements for a silent-witness foundation must be met. Taylor, 398 Ill. App. 3d at 86. Of central concern to us was that the State failed to address the fact that the VHS tape it introduced into evidence was a digital-to-analog copy of the original recording. Taylor, 398 Ill. App. 3d at 87. The State failed to provide evidence that the tape was not the product of tampering or editing. Taylor, 398 Ill. App. 3d at 87. We concluded that the only way to protect the integrity of the evidence was to require a chain of custody as part of the foundation. Taylor, 398 Ill. App. 3d at 90.

Here, the original recording in Morici's camcorder did not appear to be a digital recording. However, the images the camcorder captured were just as susceptible to alteration in the copying process; indeed, Morici testified that the copy was altered by omitting portions of the original. Consequently, the foundation for admitting the tape as substantive evidence required something more rigorous than Morici's testimony that the video in evidence truly and accurately depicted that which it purported to depict.

The standards for the admission of real evidence protect against tampering and fabrication:

"Before real evidence may be admitted at trial, the State must provide an adequate foundation, either through testimony or stipulation, that establishes that the item sought to be introduced is the actual item involved in the alleged offense and that its condition is substantially unchanged. [Citation.] Where an item possesses unique and readily identifiable characteristics and its substance is relatively impervious to change, an adequate foundation is laid by testimony that the item sought to be admitted is the same one recovered and in substantially the same condition as when recovered; however, if the item is not readily identifiable or is susceptible to alteration by tampering or contamination, its chain of custody must be established with sufficient completeness to render it improbable that the original item has been exchanged, contaminated, or subjected to tampering." People v. Whirl, 351 Ill. App. 3d 464, 470-71 (2004).

In Taylor, we said that a visual recording is more like a baggie of cocaine than a gun and that an adequate chain of custody will generally be necessary to authenticate a visual recording. Taylor, 398 Ill. App. 3d at 95. Therefore, the videotape here was inadmissible by real-evidence standards because it was altered. Morici testified that there had been a different tape, the original, that included

footage he had taken for insurance purposes; in other words, the evidence tape was a copy whose contents Morici had altered from those in the original's. Beyond that, Morici seemed to go out of his way to make obscure the process by which he produced the evidence tape, so reconstructing the process that he used is a matter of guesswork.

An altered copy produced by an unexplained process is not acceptable as substantive evidence. In addition, the technological shift to digital visual recordings, with the prevalence of image-altering computer programs, puts a burden on the trial court to apply real-evidence standards in a way that responds to the technological context. We therefore hold that an adequate foundation must show that the original has been preserved without change, addition, or deletion and that, if a copy is introduced into evidence, there must be a cogent explanation of any copying such that the court is satisfied that during the copying process there were no changes, additions, or deletions.

Returning to the tape here, we state in summary that the foundation for demonstrative use of the tape was insufficient for its substantive use. Further, although it might be proper to permit a witness to illustrate his or her testimony with an edited recording, use of such a recording is inconsistent with the rules for the admission of substantive evidence. "The admission of evidence is within the sound discretion of the trial court, and its ruling should not be reversed absent a clear showing of abuse of that discretion." People v. Tenney, 205 Ill. 2d 411, 436 (2002). Here, the trial court abused its discretion when it considered the tape as substantive evidence, and we reverse defendant's conviction.

The question remains whether the State should be allowed to retry defendant. "The double jeopardy clause precludes the State from retrying a defendant after a reviewing court has determined that the evidence introduced at trial was legally insufficient to convict, but the double jeopardy clause

does not preclude retrial of a defendant whose conviction has been set aside because of an error in the proceedings leading to the conviction." People v. Howard, 387 Ill. App. 3d 997, 1006-07 (2009). In the present case, it was error to admit the videotape as substantive evidence. However, the tape was admissible as demonstrative evidence. Moreover, the court was free to credit Morici's testimony and the evidence of defendant's suspended license. Thus, the State presented sufficient evidence of defendant's guilt. See People v. Siguenza-Brito, 235 Ill. 2d 213, 228 (2009) (the "testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant").

Defendant argues that the proof was insufficient because, whereas Morici's tape shows a man with a distinct bald spot, the official Department of Corrections photograph of him shows no such bald spot. We reject this argument because the angle of the Department of Corrections photograph is not such that we can tell whether defendant has a bald spot. Upon careful review of the record in the light most favorable to the State (see People v. Billups, 384 Ill. App. 3d 844, 846 (2008)), we determine that the evidence was sufficient to support the court's finding of guilty beyond a reasonable doubt and that retrial will not expose defendant to double jeopardy.

III. CONCLUSION

For the reasons stated, we reverse the finding of guilt and remand the matter for a new trial.

Reversed and remanded.

McLAREN and BURKE, JJ., concur.