2022 IL App (2d) 200224-U
Nos. 2-20-0163 & 2-20-0224 cons.
Order filed February 16, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-81 |
| SHANNON DWYER-RIDGE, | ) ) ) | Honorable Robert P. Pilmer |
| Defendant-Appellant. | ) | Judge, Presiding. |

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-82 |
| MICHAEL C. TUMMINARO, | ) ) ) | Honorable Robert P. Pilmer |
| Defendant-Appellant. | ) | Judge, Presiding. |

**ORDER**

JUSTICE BIRKETT delivered the judgment of the court.
Presiding Justice Bridges and Justice Zenoff concurred in the judgment.

¶ 1    *Held*:  The trial court did not err in admitting footage from a home surveillance camera. The trial court did not err in denying Tumminaro's motion for a directed finding, and the evidence was sufficient to prove him guilty of disorderly conduct.

¶ 2    Following a joint bench trial, defendants, Michael C. Tumminaro and Shannon Dwyer-Ridge (Michael and Shannon), were each found guilty of disorderly conduct stemming from a 911 call and subsequent false statements to police officers that their neighbor had fired a gun in Shannon's direction while she was out walking her dogs. Both defendants challenge the admissibility of video surveillance footage, and Michael argues that the evidence was insufficient to convict him. We affirm the conviction as to both defendants.

¶ 3                                    I. BACKGROUND

¶ 4    Michael was charged by indictment with three counts of disorderly conduct. Count 1 alleged that he knowingly made a false report to Kendall County Sheriff's Deputy David Angerame that an assault had been committed in violation of 720 ILCS 5/26-1(a)(4) (West 2016). Count 2 alleged that Michael knowingly made a false 911 call that Shannon's life had been threatened in violation of 720 ILCS 5/26-1(a)(6) (West 2016). Count 3 alleged that Michael knowingly made a false report to Deputy David Lawson that the offense of assault had been committed in violation of 720 ILCS 5/26-1(a)(4). Shannon was charged by indictment with two counts of disorderly conduct. Count 1 alleged that Shannon knowingly made a false report to Deputy Angerame that an assault had been committed. Count 2 alleged that Shannon knowingly made a false report to Deputy Mike Mrozek that an assault had been committed.

¶ 5    The parties filed a series of pretrial motions. Defendants filed a motion *in limine* to bar the introduction of home surveillance video footage, based on a lack of adequate foundation. The State filed a motion for joinder of the defendants' trials pursuant to section 114-7 of the Code of Criminal Procedure (725 ILCS 5/114-7 (West 2018)) and a motion to introduce evidence that defendants

and their neighbor, the target of the allegedly false reports, have a strained relationship and that each has called the police on each other in the past. Defendants did not object to the State's motion for a joint trial or the motion to introduce evidence of the strained relationship. Both defendants waived their right to a jury trial. The trial court addressed defendants' motion regarding foundation for the home surveillance video footage during the trial.

¶ 6    The evidence at trial showed that defendants are a couple and live together on Galena Road in unincorporated Plano. Defendants' next-door neighbors are Mark and Doris Fowler. Defendants' relationship with Mark has been strained. On the evening of January 11, 2016, Michael made a 911 call to report that Shannon had been shot at by Mark Fowler. The parties stipulated to admissibility of the 911 call, and the recording of the call was played in open court. The recorded conversation went as follows:

"DISPATCHER: 911, what's the address of the emergency?

MICHAEL: (Inaudible.) The address is *** Galena Road. Plano. Um, this is the umpteenth call I've made about my neighbor at ***... Um, firing shots in the dark while we're out walking our dogs. Um. I don't know. The guy is firing shots in the dark. (Inaudible.) My girlfriend was out there with the dogs and he's firing shots.

DISPATCHER: Give me the address again?

MICHAEL: The address of where the shots are being fired from is *** Galena Road. That's where the shots are being fired from. No reason on Earth for at this time of night for shots to be fired.

DISPATCHER: I didn't get... Your phone is very distorted. You said what?

MICHAEL: I said there's no reason on this Earth for shots to be fired at this time of night. (Speaking in the background.) My girlfriend was out with my dogs, walking my

dogs, she said she heard the shots come past her. (Speaking in the background.) She's scared to death. (Speaking in the background.)

DISPATCHER: Ok, so she was out walking the dog, you said?

MICHAEL: (Speaking in the background.) Yup. This is not the first... This has been going on for a long period of time. And apparently he doesn't get the idea that its illegal to shoot after dark. Scared my dogs to death. Scared my girlfriend to death. No reason on this Earth for it.

DISPATCHER: What is your name?

MICHAEL: My name is Michael Tumminaro. T-u-m-m-i-m-a-r-o. You guys have been out here a number of times... For the same thing.

DISPATCHER: What is your phone number?

MICHAEL: 6-3-0 ***

DISPATCHER: Alright, do you want the officer to stop over to speak with you?

MICHAEL: That would be fine. (Inaudible.)

DISPATCHER: And your address was ***?

MICHAEL: That's my address, yes. The shots are being fired from ***.

DISPATCHER: [Okay], did she see who was doing it at all?

MICHAEL: There was only one person back there that shoots guns. It's a house that's isolated in the back. All your... All your officers are well aware of it. (Speaking in the background.)

DISPATCHER: Okay.

MICHAEL: It's getting to be a point where enough is enough. And... I've been patient enough, this has been going on for like a year and a half. Something needs to be

done. (Speaking in the background.)

DISPATCHER: Could she tell where at on the property it was coming from?

MICHAEL: (Speaking in the background.) Absolutely. There's only one place it can come from.

DISPATCHER: No. I... I... I know you gave me the address. I want to know where at on the property the... shots were coming from? Do you know what side? Front? Back? Rear? I mean, what?

MICHAEL: They're coming from the side... The west side of his house.

DISPATCHER: The west side of his house?

MICHAEL: Which is about 30 feet from my property.

DISPATCHER: Alright. We'll, uh... Have an officer stop over to speak with [you]. Okay?

MICHAEL: Yea. That would be appreciated.

DISPATCHER: Alright, thank you.

MICHAEL: Thank you.

DISPATCHER: Bye."

¶ 7   Deputy Angerame responded to the 911 dispatch of "shots fired." Angerame arrived at defendants' residence at approximately 8:47 p.m. Upon his arrival, Angerame spoke to both defendants in the presence of each other. Shannon told Angerame that she had taken her dogs out for a walk in the backyard and that she saw her neighbor. She told Angerame that the neighbor "shot a round off she believed to be a .40 or .45, and it whizzed past her hand" and that "her ears were ringing." Shannon told Angerame that Mark Fowler was standing on the side of his house "like the side garage door" on the west side of his house. Angerame had Shannon retrace her steps,

showing him where she was walking when she heard the shots. Angerame testified that he looked for bullet holes in defendants' house or in the six-foot fence that separates defendants' house from the Fowler's house. Angerame stated that, from what Shannon told him, based on where she was and where her neighbor was standing, the fence would have been in "the direct route." He did not find any bullet holes. Angerame also checked the outbuildings for bullet holes and found none. Angerame testified that Michael told him that he did not hear the gunshot while Shannon was out walking the dogs.

¶ 8    Angerame testified that he went to the Fowler residence to look around the area that Shannon said Fowler was standing when the shot rang out. There was a cement stoop outside the west side of the home outside the garage. There was a chair on it and a spent .22 caliber shell casing under the chair. There was snow covering everything, but there were no footprints in the area where Shannon described seeing Fowler, other than Angerame's own footprints.

¶ 9    Angerame testified that he reviewed the video surveillance footage that Mark Fowler provided and saw who he believed to be himself and his fellow Deputy Vaclavik. The footage was played in open court, over defendants' foundation objection. The video was "queued up to 9:39:24 on the video that says January 12, 2016." Angerame identified Deputy Vaclavik looking in the snow outside the Fowler residence. Another view from "channel 2" at "9:16:56" showed "an individual with a flashlight walking in the back yard." Angerame testified that the video footage "looks like a fair and accurate representation of what" he did that night.

¶ 10    On cross-examination by Shannon's attorney, Angerame testified that Shannon was upset and crying. She told him "she believed she had been shot at." Angerame conceded that while the fence was six feet tall, all a person would have to do is raise the gun to avoid putting a hole in the fence. Angerame conceded that, if Mark Fowler had opened the garage door and fired a bullet in

the air from inside the garage, he would not expect to find footprints.

¶ 11    On cross-examination by Michael's attorney, Angerame stated that Michael did tell him he "heard a shot." Michael told him he did not see Fowler shoot, but that Shannon told him so. Michael told Angerame that Shannon was crying, and she was still crying when Angerame arrived. Angerame had been called to the location in the past for "problems." He did not collect the spent .22 shall casing that he found under the chair on the stoop, even though it was found in the area where Shannon believed the shot originated. The State stipulated that Angerame told Deputy Lawson that it was possible that the snow could have "blown over the footprints due to the high winds." Angerame testified that there had been no request to do a gunshot residue test on Mr. Fowler. No attempt was made to collect firearms from Mr. Fowler and no arrests were made that evening.

¶ 12    Deputy Mrozek testified that he interviewed Shannon on January 22, 2016, regarding the alleged shooting that was reported on January 11, 2016, involving her neighbor, Mark Fowler. The interview was recorded. Shannon told Mrozek that at about 9:00 p.m., she had taken her two dogs out to relieve themselves. She exited the back door of her residence and walked south on her property line. "Once the dogs had taken care of their business, she was turning back to walk north into her residence[,] and she heard a gunshot whiz by her right ear." Shannon stated that, before she heard the gunshot, she saw her neighbor's garage door open, and she saw the top of her neighbor's head. Shannon stated that she estimated the caliber of the bullet to be a .40 or .45. She based her estimate on her experience being around firearms. Shannon said she had consumed three beers that night, but she was not intoxicated.

¶ 13    On cross-examination, Mrozek testified that he had also interviewed Shannon on January 18, and she had been consistent. Shannon told him she did not hear the bullet "ricochet" or "hit

anything." Shannon was able to identify Mark Fowler by the top of his head and the hat he was wearing. She did not actually see Fowler firing a weapon.

¶ 14    Sergeant David Lawson of the Kendall County Sheriff's Office testified that he met with Mark Fowler at Fowler's home on January 19, 2016, to pick up a surveillance video on "a USB drive containing numerous video files." A USB drive is like a thumb drive. Lawson made a copy of the USB drive for the State's Attorney's Office and placed the original USB drive in evidence. Lawson watched the video at Fowler's residence as well as the footage on "the copy that was made." Lawson testified that he saw no discrepancies between the original footage and the copy that was made.

¶ 15    Lawson testified that on January 22, 2016, he met with Michael at the Sheriff's Office for a recorded interview. Michael told him that, on the night of January 11, 2016, he heard a single gunshot that "sounded like a .45 caliber pistol." Michael said he is an avid shooter and that it was definitely not a rifle. Michael said he was sitting on his rear enclosed porch that has single pane glass, when he heard the "crack of the .45 caliber." He said that he saw Shannon "out walking the dogs at that time" and that, after the gunshot, "he saw both the dogs as well as Miss Dwyer[-]Ridge move quickly towards the back porch."

¶ 16    On cross-examination, Lawson stated that Michael did not say he saw "any type of gunshot." Michael agreed to allow his interview to be recorded. During the interview, Lawson did not tell Michael that he was in possession of the video footage turned over by Mr. Fowler. Michael told Lawson that Mark Fowler had actually shot a firearm "from the same location earlier in the day." Lawson testified that Michael was very cooperative and forthcoming. Michael told Lawson that he had a clear view of the entire back area "with the motion lights activated." Michael said that Shannon was "shaking" and was "distraught" when she came inside. She told him that the

shot flew by her heard. Michael told Lawson that he suspected that Mr. Fowler "videotaped" Michael's property "pretty much at all times."

¶ 17 Lawson clarified that he watched the video footage on Fowler's system before he took the USB drive. He watched the footage on a large screen at the Sheriff's Office and could see much more detail.

¶ 18 Peter Stoneberg testified that he has been an acquaintance of Mark Fowler for 25 years, but they are not close friends. The two men know each other through an archery shop. In January 2016, Stoneberg received a call from the owner of the archery shop, asking Stoneberg to help Mark Fowler. He was asked to "pick him up a hard drive and a USB stick." Stoneberg was told that Fowler needed some help with his video system. On January 16, 2016, Stoneberg went to Fowler's residence. Mark Fowler showed him the system in the garage. Stoneberg "read the manual" which Fowler provided, "to figure out how to at that point copy the drive." Stoneberg was asked to "take files from one area and transfer them onto a USB drive and a terabyte drive." Stoneberg transferred the files as requested. He did not make "any alterations to the files." Fowler positioned the "date, time and then the duration." Stoneberg made sure the "parameters of the backup were correct." Fowler gave a three hour window that he wanted transferred onto the USB drive. Stoneberg "plugged into the USB port in the back." He stated that "there's a utility on the software system that he had that said you can copy the whole drive." Stoneberg said he was not familiar with Fowler's camera system, but he testified that his own "system at home overwrites the drive every 30 days." Fowler told him that his system also would "overwrite itself." Stoneberg stated that he made no changes between what he put on the USB drive and what he put on the terabyte drive. Stoneberg did not watch the video. According to the USB drive, the file containing the video was created on January 16, 2016. Stoneberg did not "adulterate the video in any way to change the time

stamp on the video." He never watched the video or spliced it in any way.

¶ 19    On cross-examination, Stoneberg testified that he did not know what happened on January 11, 2016, or if Fowler had deleted or altered any files. He did not verify that there were no deletions, because he did not watch the video footage himself. Stoneberg said the manual for the system was still in the original packaging. Stoneberg did not know whether Fowler had set up the security system himself or if he had help.

¶ 20    Mark Fowler testified that, on the evening of January 11, 2016, he was laying on his couch with his leg elevated because he was recovering from knee surgery. He was wearing pajamas and his knee was bandaged. His wife was upstairs. The doorbell rang and it was police officers. The officers asked him if he had been shooting any firearms between 7:00 and 9:00 that evening, and he answered, "No." Fowler acknowledged that he had called the police "a few times" to complain about his neighbor, Michael, and that Michael had called the police multiples times on him. Because of all the complaints, Fowler "put in a camera system so it would take away the problem with he said/she said." Fowler installed five cameras and had since added some, taken some down, and moved some. He testified that, on January 11, 2016, the camera system was in working order. Fowler described setting up the system:

> "Q [(THE STATE)]. When you installed the camera system, they had a manual that came along with it, correct.?
>
> A [(FOWLER)]. No manual came along with it. You had to download it off the Internet. I had a little card telling you how to get it going, basically plug and play. Plug the cameras in, plugged it in and set the date.
>
> Q. So you set the date on the cameras?
>
> A. Yes.

Q. Do you remember if you set it correctly?

A. I thought I did, but I was a day off. And once it's taped on that day, you can't move it back. And I hadn't figured out [how] to move them back yet because I didn't have a manual or anything to tell me.

Q. So, you've seen the video surveillance that you copied—you had copied for the Sheriff's Department on January 11, 2016?

A. Yes.

Q. The video surveillance that you're alleging that you were seeing in Mr. Fowler's house on that day, it's from the 11th, had a date stamp of January 12th?

A. Correct.

Q. When you set up the camera system, was it set up so that it could record?

A. Yes.

Q. And did all the cameras kind of go to a central location?

A. You have to run the wires to one location.

Q. That's based on the computer system?

A. That's the system right there.

Q. Were you able to watch the video screens—did you have a way to watch the video screens in live time?

A. Yes.

Q. Would the time stamp be on there and the date stamp?

A. Yes.

Q. Were you able to ever look at the time stamp, the date stamp, the image, and corroborate that's actually what's occurring when you were watching it?

A. Yes."

Fowler said that, from his computer surveillance system, he could watch someone approaching his residence and then open the door and confirm seeing the same person. He said he had checked all the cameras, and that they were all working.

¶ 21     Fowler testified that, after the deputies came to his house on January 11, 2016, he pulled up the video footage from that night and watched it. The surveillance system records in a continuous manner and with the number of cameras he has, it is five or six days before the system starts rewriting. Fowler testified that he was unsure of how to download the relevant footage. He spoke to the State's Attorney the next day and was told that they wanted the video footage. Fowler testified that he made no alterations or deletions to the footage before Mr. Stoneberg copied the footage. Fowler told Stoneberg that the footage the State's Attorney wanted to see and "then he put in the dates and times."

¶ 22     As to the activity depicted on the video, Fowler said he didn't know what happened, because he was watching T.V. The only way he knew what occurred was because he watched the footage. Fowler turned the USB drive over to an officer who was sent out to collect it. He made no changes to the USB drive. He later gave a "big drive" to the sheriff's deputy that had the entire recording device on it. He made no changes or deletions to that device from the time it was downloaded to when he gave it to the deputy. Fowler described the various camera positions and their angles, which are all depicted on the screen, each with its own channel. Two of the camera angles take in the views of Michael's residence as well as the six-foot fence between the properties. Fowler watched the video footage from the evening of January 11, 2016, and made no changes that were stored on the USB drive. The State moved to admit the video footage into evidence.

¶ 23     Defense counsel for Shannon objected, based on insufficient foundation. First, counsel

argued that, despite Fowler's explanation, the footage is "time stamped wrong." Counsel argued that Fowler was not watching the video in real time to be able to say "it's a fair and accurate depiction of what took place on that particular date." Counsel argued that "we have a history between [Michael] and Mr. Fowler." Counsel also argued that Fowler was in possession of the video footage for five days before Stoneberg downloaded it. Counsel argued that, due to the "admitted animosity" between defendants and Fowler, there was not "enough indicators of reliability" for admission of the video footage into evidence. Summarizing, counsel stated that, "based on the history, based on there being no contemporaneous viewing, we believe there's insufficient foundation to admit it." Counsel for Michael had no additional argument, but joined in the objection based on insufficient foundation.

¶ 24    The State argued that Fowler's testimony, together with Mr. Stoneberg's testimony, established a sufficient foundation under the "silent witness theory," citing *People v. Flores*, 406 Ill. App. 3d 566 (2010) and *People v. Montes*, 2013 IL App (2d) 11132. The State noted that Fowler testified that he installed the camera system and checked to make sure the system was accurately recording what was "actually occurring." No deletions or alterations were made. Stoneberg made a copy of what Fowler asked him to do and he also made a copy of the entire drive. Sergeant Lawson testified that no changes were made to the footage since it came into his possession.

¶ 25    Counsel for Shannon responded that the *Flores* decision states that a "chain of custody" is required under the silent witness theory, when there is no party to testify to the accuracy of the recording. Counsel argued that this is particularly true in a digital format, which is "susceptible to editing and outright fakery." Counsel again cited the "history between the two parties." The trial court overruled the objection.

¶ 26    Video from Channel No. 2, Extra, starting at 8:33 to 8:42 was played in open court. Mr. Fowler described the image depicted in the video. The State then fast forwarded the footage to 8:34:50 and played the footage, ending at 9:17:32. Fowler confirmed that the time stamp means "9 p.m., 17 minutes, 32 seconds" on January 11, 2016.

¶ 27    On cross-examination by Shannon's attorney, Fowler acknowledged that, on the night of January 11, 2016, he did not take the police to his garage to view the recording from 45 minutes earlier that night. Fowler acknowledged that he owns both a .22 caliber handgun and rifle. He acknowledged that he owns roughly 30 firearms, including a .40 caliber. He added that his father owns a .45, which is kept at Fowler's house. Fowler acknowledged that he fired a gun on his property the morning of January 11, 2016, and that he did not clean up the brass after he was finished shooting. He was shooting a .22 that morning.

¶ 28    Fowler acknowledged the animosity between him and Michael. He once called the police on Michael to tell them that Michael was "shooting unsafely" in Fowler's direction. Fowler admitted shooting at night in the past, but that he "does not make a practice of it." Fowler denied shooting intentionally to scare his neighbor's dogs.

¶ 29    On cross-examination by Michael's attorney, Fowler testified that he has a target set up in the field behind his house. Fowler testified, "I shoot when I shoot." Fowler denied intentionally shooting to scare the dogs and that when Michael shoots, the dogs go up to the house, same as when he shoots.

¶ 30    On re-direct examination, Fowler explained that a .22 caliber shot is quieter than a larger caliber shot. It is like a "snap" as opposed to a "boom with a .45."

¶ 31    Fowler's son-in-law, Ronald Groom, testified that he lived at the Fowler residence on January 11, 2016. He arrived home at about 9:00 p.m. He did not fire any firearms that night.

¶ 32    Mark Fowler's wife, Doris, testified that, on January 11, 2016, between 7:00 and 9:00 p.m., she was watching T.V. upstairs. She did not hear anything out of the ordinary, and she did not fire any firearms.

¶ 33    On cross-examination, Ms. Fowler acknowledged that Mark fires his firearms in the back of their house quite often. She testified that they have lived in that house for 13 years of their 40-year marriage. The State rested after Ms. Fowler's testimony.

¶ 34    Counsel for both Michael and Shannon made motions for directed findings of not guilty. Counsel for Shannon argued that her statement to the officers that she heard a gunshot was "confirmed by Mr. Tumminaro." Counsel noted that Fowler admitted to shooting quite often and that in the area where Shannon stated Dowler was standing, there was a single bullet casing. Counsel noted that the police did not collect the casing and they did not do a gunshot residue test on Fowler. Counsel also pointed out that the absence of a bullet hole in the six-foot fence is easily explained away if the shooter pointed the gun above the fence. Finally, counsel noted that Shannon was "scared."

¶ 35    Counsel for Michael argued that the evidence showed that Mr. Fowler fired his weapons "from that location numerous times," including times when the dogs are out there and react to the gunfire. Counsel argued that "this is a continuation of that conduct." Counsel argued that what Michael told the 911 dispatcher was "based on the report from Miss Dwyer[-]Ridge." She told Michael that she heard a shot and she was crying and shaking as shown by the 911 recording. Counsel argued that when he made the 911 call, Michael "had every reason to believe that something occurred and it required a law enforcement response."

¶ 36    The State argued that when you compare the 911 call to the video surveillance, "it doesn't match up." The State noted that the police responded to the 911 call at 8:47 p.m. The video shows

an individual walking out with the dogs at 8:33 p.m. and the individual walking back on camera at 8:42 p.m. "No one is running, Judge." The State argued that the video surveillance refuted Shannon's story that she told to the deputies, claiming that she "picked up her pace and ran." The trial court denied the motion for a directed finding as to both defendants.

¶ 37    Shannon testified that, at about 8:00 p.m. on January 11, 2016, she and Michael were sitting on the back porch having a few beers and smoking. Their friend, Rhonda, was inside the house sleeping. Shannon said she was not intoxicated. She stated that she took her two golden retrievers outside. She took the dogs out past the garage and went "out to the back of the property" and waited for the dogs "to do their business." Shannon testified that, when she turned back to return to the residence, she saw Mark Fowler standing "on the stoop of the side door of his garage." She recognized Fowler from the hat on his head. Shannon guessed that she was about 250 feet away from Fowler. As she was walking back towards her residence, Shannon said she heard a shot come from her right, the same direction of Fowler's property. She was facing north towards her residence. Although she is not an expert in firearms, Shannon guessed the shot came from a .40 or a .45 caliber. She did not see Fowler actually shoot. After hearing the shot, Shannon said she began moving "as quickly" as she could back to the house because she "was scared." She said she heard the crack of a gun "like something went past" her right ear. When she got back to the house, she was very upset and told Michael to call the police. She testified that she told the police "substantially" the same story she told in court. She said she had Michael call the police because she was in fear of her life.

¶ 38    Shannon testified that Mark Fowler shoots on his property "pretty often," and that she has heard him shoot at night before the evening of January 11, 2016. She testified that she knew before January 11 that Fowler had surveillance cameras facing her property. She had no relationship with

Mark Fowler, but was friends with his wife, Doris. She denied having any "ill will against Mr. Fowler." Shannon repeated that she had Michael call the police because she felt that she was shot at and was in fear of her life.

¶ 39 On cross-examination, Shannon acknowledged that she told the police that she heard the shot ring out, that it "whizzed past" her ear, and that it caused "ringing" in her ear. She admitted that she didn't start running towards her house, but she "quickened" her pace, because she didn't know "if there was [going to] be another one."

¶ 40 Michael declined to testify, and both defendants rested. The State argued that the video footage refuted the story Shannon told to the police and her testimony. The video shows that at "no time" did Shannon pick up her pace.

¶ 41 Shannon's attorney argued that the police failed to collect or even photograph the spent .22 shell casing or do a gun shot residue test on Mark Fowler. The police also failed to look at the surveillance video that day. Counsel argued that he saw the video footage and what he saw was "shadows." He argued that it is possible that, "at the exact time Ms. Dwyer-Ridge is leaving her residence, Mr. Fowler is outside his garage door, shoots up in the air, and goes back inside to try to scare my client."

¶ 42 Michael's attorney argued that it was a "stretch" to say his client made a false 911 call, because his call was "prompted by a third person." Michael reported events that were relayed to him by Shannon. Counsel argued that Michael never used the word "assault," and the police did not take the steps they "typically would on an assault charge." Counsel argued that, in order to find Michael guilty, the trial court would have to find that "this was a planned and concocted act, *** and the facts just don't relay that." Counsel noted that, other than hearing a shot, "everything else was relayed to him by Ms. Dwyer-Ridge." Counsel argued that there was evidence that a shot was

fired from the location that Shannon identified, and that if defendants were lying, "it was not a very good lie."

¶ 43    The trial court found that all of the State's witnesses were credible and entered findings of guilty on all counts as to each defendant. Both defendants filed motions for a new trial. With respect to the issue of foundation for the surveillance video, defendants argued that, given the delay between January 11 and 16, "Fowler had ample opportunity to alter the videos [himself] prior to Peter Stoneberg ever making a copy." The trial court stated that it had reviewed the trial transcripts as well as *People v. Taylor* and denied the motions. Each defendant was sentenced to a period of conditional discharge and filed timely appeals.

¶ 44                                    II. ANALYSIS

¶ 45    On appeal, Michael raises three issues: (1) that the trial court erred in admitting the surveillance video; (2) that the trial court erred in denying his motion for a directed finding of not guilty; and (3) that the evidence was insufficient to support a guilty finding. Shannon raises a single issue, that the trial court erred in admitting the surveillance video because the State failed to establish an adequate foundation.

¶ 46                              A. Foundation for Video

¶ 47    We first address the issue common to both defendants' appeals, whether the trial court erred in admitting the surveillance video. Both defendants argue that the trial court committed reversible error where it admitted the surveillance video that lacked foundation and was prejudicial. We review the admissibility of evidence for abuse of direction. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). An abuse of discretion occurs when the ruling of the trial court is arbitrary or fanciful or where no reasonable person would adopt the trial court's view. *Id.*

¶ 48    Defendants' foundation arguments go to the trial court's determination that the surveillance

video footage was properly authenticated. Illinois Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The most common method of authentication is the testimony of a witness who has sufficient personal knowledge to satisfy the trial court that a particular item is, in fact what its proponent claims it to be. See *Cisarik v. Palos Community Hospital*, 144 Ill. 2d 339, 342 (1991); Ill. R. Evid. 901(b)(1) (eff. Jan. 1, 2011). Rule 901(b) provides "by way of illustration" that "[e]vidence [produced] describing a process or system used to produce a result and showing that the process or system produces an accurate result" satisfies the requirement of authentication. Ill. R. Evid. 901(b)(9) (eff. Jan. 1, 2011).

¶ 49    In *People v. Taylor*, 2011 IL 110067, ¶ 27, our supreme court noted that it had pointed out in *Cisarik* that "videotapes are admissible on the same basis as photographs." "Most jurisdictions allow photographs and videotapes to be introduced as substantive evidence so long as a proper foundation is laid." *Id.* ¶ 32. "A proper foundation may be laid by someone having personal knowledge of the filmed object, [who can testify] that the film is an accurate portrayal of what it purports to show." *In re D.Q.*, 2016 IL App (1st) 160680, ¶ 25. Video evidence may also be admitted under the "silent witness" theory, under which it is unnecessary to have a witness testify to the accuracy of the images depicted in the video. *Taylor*, 2011 IL 110067, ¶ 32. Our supreme court agreed with the factors identified by this court in *People v. Taylor*, 398 Ill. App. 3d 74 (2010), that are to be considered in determining whether a proper foundation has been laid. *Id.* ¶ 35. Those factors are: (1) the device's capability for recording and general reliability; (2) competency of the operator; (3) proper operation of the device; (4) showing the manner in which the recording was preserved (chain of custody); (5) identification of the persons, locale, or objects depicted; and (6)

explanation of any copying or duplication process. *Id.* Our supreme court went on to

> "emphasize that this list of factors is nonexclusive. Each case must be evaluated on its own and depending on the facts of the case, some factors may not be relevant or additional factors may need to be considered. The dispositive issue in every case is the accuracy and reliability of the process that produced the recording." *Id.*

Defendants argue in summary that the State failed to establish an adequate foundation under the silent witness theory, citing these facts: that the "date stamp" was off by one day; that there was a delay in copying the footage and turning it over; that Mark Fowler had no expertise; that Fowler's testimony was that no manual came with the system and he followed the instructions on a card whereas Stoneberg said there was a manual; and that Fowler "did not watch the video on the night of the incident."

¶ 50    We cannot find that the trial court abused its discretion in admitting the surveillance video. With respect to the date stamp being off, Fowler explained it and the testimony of Deputy Angerame confirmed that the footage came from the night of January 11, 2016, as the footage fairly and accurately depicted him and his partner looking for evidence in the defendants' yard. We note that the footage has a running clock and that there are no time gaps in the footage. While Fowler had no particular expertise in computers, the evidence establishes that the equipment worked properly and when he had concerns about the system overwriting the footage, he called for help from Stoneberg. There is no claim by defendants that the cameras were not working properly. Defendants' suggestion that Mark Fowler had time and motive to tamper with or make alteration to the video footage is not a basis to find an abuse of discretion by the trial court. Absent actual evidence of tampering or substitution, deficiencies in the chain go to weight, but do not affect admissibility. See *People v. Alsup*, 241 Ill. 2d 266, 275 (2011).

¶ 51                    B. Denial of a Directed Finding and Sufficiency of the Evidence

¶ 52    Michael argues that the trial court erred in denying his motion for a directed finding of not guilty. He argues that the issue is not whether Mark Fowler shot a .40 or .45 caliber bullet past Shannon, but whether the State presented sufficient evidence to show that defendant knew Shannon "did not reasonably believe a shot was fired, and whether Defendant knew this or reasonably should have known this when he called 911 and eventually relayed the information to responding officers." Michael argues that "no direct evidence was presented showing [he] knew or reasonably should have known Dwyer-Ridge was not truthful to him."

¶ 53    A motion for a directed finding (verdict) asserts that, as a matter of law, the evidence is insufficient to support a finding or verdict of guilty. *People v. Withers*, 87 Ill. 2d 224, 230 (1981); 725 ILCS 5/115-4(k) (West 2018). In ruling on a motion for a directed finding, the trial court considers "only whether a reasonable mind could fairly conclude the guilt of the accused beyond a reasonable doubt, considering the evidence in a light most favorable to the State." *People v. Connolly*, 322 Ill. App. 3d 905, 914 (2001) (citing *Withers*, 87 Ill. 2d at 230).

¶ 54    We disagree with Michael's argument that there was no direct evidence presented that he knew or should have known Shannon was not being truthful. Michael's 911 call, as well as his statements to the police, are direct evidence. See *People v. Frazier*, 129 Ill. App. 3d 704 (1984). We also note that, for purposes of weight to be given to the evidence, there is no legal distinction between direct and circumstantial evidence. *People v. Robinson*, 14 Ill. 2d 325, 331 (1958). In the 911 call, Michael claimed that his neighbor was out firing "shots" in the dark while his girlfriend was out with the dogs. He tells the 911 dispatcher that "[his girlfriend] said she heard the shots come past her." Defendant told the dispatcher that "enough is enough," and something "needs to be done." He further told the dispatcher that the shots came "from the west side of his house."

¶ 55    The video footage, as described by the State, shows a person walking away from defendant's residence at 8:33 along with two dogs. At 8:41:20, the first dog returns. At 8:42:02, the person and the second dog return, walking at the same pace. There is no apparent reaction by either the person or the dogs to a gunshot. The video, together with the time frame and activity, leads to a reasonable inference that the person seen with the dogs is Shannon. We agree with the State that the video footage refutes the stories the defendants told to the police. We also note that the trial court found that the testimony of Mark and Doris Fowler was credible. Mark denied firing a shot or hearing a shot, as did Doris. The trial court did not err in denying the motion for a directed finding.

¶ 56    Michael's argument that the evidence was insufficient to support a guilty finding essentially requests that we reweigh the evidence. He argues that all the information he had "supported his belief that what [Shannon] then reported to him was correct." Michael's argument presents a question of fact, which is reviewed to determine "whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Cardamone*, 232 Ill. 2d 504, 517 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19). Under this standard, all reasonable inferences from the record must be allowed in favor of the prosecution. *People v. Bush*, 214 Ill. 2d 318, 326 (2005). Allowing all reasonable inferences to the prosecution, we find that the evidence was sufficient to support the trial court's guilty findings.

¶ 57                                III. CONCLUSION

¶ 58    For all the foregoing reasons, we affirm the trial court's ruling on the admissibility of the surveillance video footage and defendants' convictions.

¶ 59    Affirmed.